UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Robert J. Gargas,                                    Case No. 3:20-cv-590

              Plaintiff,

       v.                                            MEMORANDUM OPINION
                                                           AND ORDER

Estes Express Lines, Inc.,

              Defendant.


## I.    INTRODUCTION

       Plaintiff Robert J. Gargas and Defendant Estes Express Lines, Inc. have filed cross-motions

for summary judgment.  (Doc. No. 49; Doc. No. 50).  Each opposed the other's motion.  (Doc. No.

55; Doc. No. 57).[1]  Gargas also filed a motion to disregard parts of a declaration Estes Express

attached to its motion for summary judgment.  (Doc. No. 58; *see* Doc. No. 50-3).  Estes Express

opposed that motion.  (Doc. No. 59).  Gargas filed a brief in reply.  (Doc. No. 60).  For the reasons

stated below, I deny Gargas's motion for summary judgment in full, grant in part and deny in part

Estes Express's motion for summary judgment, and grant in part and deny in part Gargas's motion

to disregard.

---

[1]  Gargas's initial response in opposition to Estes Express's motion for summary judgment can be
found at Doc. No. 54.  Gargas filed an amended response in opposition to correct a typographical
error in his initial opposition brief.  (*See* Doc. No. 56 at 1-2).  Estes Express did not oppose the
filing of this corrected brief.

## II.    BACKGROUND

### A.    ESTES EXPRESS'S TRUCKING OPERATION

Estes Express is a freight transportation trucking company.  (*See* Doc. No. 50-3 at 3).  It operates out of terminals across the United States, including a terminal in Toledo, Ohio.  (*Id.* at 4).  Estes Express employs different types of truck drivers who have different duties: linehaul drivers, hub drivers, pickup and delivery drivers ("P&D"), and combo drivers.

Linehaul drivers generally drive freight over long distances from terminal to terminal, often across state lines, using larger tractor trailers.  (Doc. No. 50-3 at 4; Doc. No. 43-1 at 29).  They can be on the road for days or weeks at a time.  (*See* Doc. No. 43-1 at 29-30).  Hub drivers generally use a single terminal as their home base and make trips to one or more nearby terminals where they work another job type, such as loading and unloading freight, until they drive back to the terminal from which they originated.  (*Id.* at 34-36).  P&D drivers, in contrast, are responsible for the first leg or the last leg of a shipping journey.  (*See* Doc. No. 50-3 at 3-4).  P&D drivers are "domiciled at a single terminal" because they pick up freight from customers nearby and deliver it to the terminal to be shipped elsewhere, or they deliver freight to its final destination if that destination is also near the terminal.  (*Id.* at 4).

Meanwhile, combo drivers are "utility" workers responsible for a range of duties, including local P&D driving, longer hub and linehaul runs, loading and unloading freight at the terminal, and loading and unloading freight for customers.  (*See* Doc. No. 43-16; Doc. No. 43-3 at 90).  Longer-distance driving assignments, such as linehaul runs, are paid per mile.  (Doc. No. 43-1 at 143-46).  Shorter-distance runs and non-driving work is paid on an hourly basis.  (*Id.*).

Gargas worked as a "combo" driver for Estes Express out of its Toledo terminal from March of 2014 until he was removed from eligibility in June of 2019 and then terminated on February 25, 2020.  (Doc. No. 47-1 at 36-37; Doc. No. 48-4).

A major dispute in this case concerns the day-to-day reality of combo drivers' duties at the Toledo terminal and, relatedly, how much of that work is performed at night or overnight.  (*See* Doc. No. 55 at 26-27; Doc. No. 57 at 20-33).  Estes Express maintains driving at night or overnight is an essential part of the combo driver position because of the "utility" nature of the role and the unpredictability of the work.  (*See* Doc. No. 55 at 26-27).  Tracey Hughes, Estes Express's Rule 30(b)(6) representative, testified Estes Express "cannot guarantee that a driver is not going to drive into the night or at night" because of the unpredictable nature of the freight trucking business. (Doc. No. 43-1 at 142-43).  The job description for combo drivers in the Estes Express employee handbook states that combo drivers "[m]ay be required to drive different schedules and work the dock based on business needs" and [a]s approved by [the Safety Department], will be allowed/needed to run over-the-road on occasion, as dictated by business needs."  (Doc. No. 48-5 at 1).  Further, Gargas testified the hours for a P&D driver could extend as late as 11:00pm.  (Doc. No. 48-1 at 124).

Gargas asserts that in reality combo drivers at the Toledo terminal performed very little nighttime or overnight work, and that longer-distance linehaul work was rare.  (*See* Doc. No. 57 at 20-33).  Gargas testified he almost exclusively did city-based daytime P&D work during his tenure. (*See* Doc. No. 48-1 at 57, 65, 94, 108).  To the extent combo drivers were "rotated" into linehaul work (for example, covering linehaul runs for a week or two at a time), Gargas stated Estes Express required the "bottom four or five" people with the "lowest seniority" to take these runs.  (*Id.* at 101). Gargas also testified the Toledo terminal had relatively predictable hours for combo drivers and that he consistently drove a "daytime shift" typically ending at 6:00 or 7:00pm.  (*Id.* at 96, 192).

### B.    GARGAS'S SUPRAVENTRICULAR TACHYCARDIA

On November 29, 2017, after being involved in a truck accident while driving for Estes Express, Gargas visited the emergency room at the University of Toledo Medical Center.  (*See* Doc.

No. 42-1 at 4). The treating physician there diagnosed him with supraventricular tachycardia ("SVT"), "an abnormal heart rhythm that causes the heart to beat very fast" for periods of time, sometimes at "greater than 100 beats per minute." (*Id.* at 7). The symptoms of SVT can include "feeling your heart beat rapidly," "shortness of breath," "dizziness," "lightheadedness," and "chest pain or pressure." (*Id.*).

About a month later, on January 8, 2018, Gargas attended a follow-up appointment with Dr. Ahed T. Nahhas, where he reported he "ha[d] not had any recurrence of symptoms" since the accident. (Doc. No. 42-2 at 2). Gargas was prescribed Toprol XL, a heart medication designed to control abnormal heart rhythms, on a continuing basis. (*See id.* at 3). Gargas saw Dr. Nahhas three times after his initial appointment: June 11, 2018, December 11, 2018, and June 11, 2019. (*See* Doc. No. 42-14 at 3; Doc. No. 42-16 at 2; Doc. No. 42-15 at 2-3). On each occasion, Dr. Nahhas continued the course of treatment with Toprol XL and noted that Gargas had not experienced a reprise of any symptoms associated with SVT. (*See id.*).

When asked at his deposition about how his SVT affected him, Gargas testified that his heart condition had not prevented him from engaging in his "normal life" activities. (Doc. No. 48-1 at 89). Gargas lists weightlifting, fishing, boating, and cardio as hobbies, and although Gargas explained his SVT causes him to worry more about "overdoing it," he has engaged in these activities as often as he has wanted to since being diagnosed. (*Id.* at 86-87). In addition, Gargas denies his Toprol has any effect on the normal functioning of his life, including "driving." (*Id.* at 209). Instead, Gargas repeatedly asserted that his SVT has required him to "pay attention" more to what he is doing because of concern his condition may return. (*Id.* at 89, 209).

After his diagnosis, Gargas applied for, and received, workers' compensation benefits because of the SVT and because of a separate physical injury sustained in the truck accident. (*See* Doc. No. 42-1). Estes Express participated in this process through its counsel, and though it

4

opposed some aspects of the compensation award, it "certified . . . supraventricular tachycardia, precipitated by a single event work related [motor vehicle accident]" as an allowed condition. (*Id.* at 274). Estes Express admitted in its response to Gargas's first set of requests for admission that "Estes was aware that Plaintiff was diagnosed with supraventricular tachycardia, ('SVT') as a result of a motor-vehicle accident that occurred on or about November 29, 2017." (Doc. No. 50-1 at 14). Estes Express further admitted "that an employee of Defendant had knowledge that Plaintiff was prescribed Toprol." (*Id.* at 15).

In addition, Gargas submitted two United States Department of Transportation certifications of his medical fitness to drive a commercial vehicle in February of 2018 and February of 2019. (*See* Doc. No. 48-8; Doc. No. 48-9). The first, signed by a doctor on February 24, 2018, approved Gargas to drive for one year with "no medical limitation" but with periodic monitoring, and its "Driver Health History" section notes a history of heart problems and breathing problems. (*See* Doc. No. 48-8). The second, signed by a doctor on February 9, 2019, again approved Gargas to drive for one year with periodic monitoring for "tachycardia," but its "Driver Health History" section indicates Gargas does not have a history of heart problems or breathing issues. (*See* Doc. No. 48-9).

### C.    GARGAS'S SCHEDULE AND ESTES EXPRESS'S "ROTATION OF DRIVERS"

After the accident and his SVT diagnosis, Gargas asserts he and Estes Express developed an informal arrangement regarding his working hours. Because Gargas was one of the more senior combo drivers at the time, he was able to decline nighttime linehaul runs and, as a result, worked almost exclusively during the day. (*See* Doc. No. 48-1 at 94-99). Gargas says he told two Toledo terminal managers, "Todd" and "Bev," that "I need to stay on daytime shift, exactly where I'm at." (*Id.* at 96-97). Gargas says his supervisor Shane March, and March's supervisor Matt Frymire, "all knew since the accident that that's what I was doing. They all knew I was -- you know, they

somewhat knew I was on medication. They knew that I was coming in at that time, and that's, you know, what worked." (*Id.* at 94, 99). March denies knowing about Gargas's SVT, his medication, or his daytime work restriction; Frymire was not deposed. (Doc. No. 45-1 at 45-46). Regardless, Gargas says this status quo persisted for nearly a year and a half, for all of 2018 and the first five months of 2019. (*See* Doc. No. 48-1 at 94-97).

In May of 2019, an increase in freight levels at the Toledo terminal left Estes Express with a glut of linehaul runs it needed drivers to fill. (*See* Doc. No. 47-1 at 19-20). In response to complaints from long-term P&D drivers who were being required to take these linehaul runs, Tom Lamb, the District Operations Manager overseeing the region including the Toledo terminal, decided to temporarily rotate all combo drivers into these runs while Estes Express determined how to better distribute the workload on a longer-term basis. (*Id.* at 10-11; 21-22). Lamb coordinated with Mark Benschoter, the manager for the Toledo terminal, to implement the plan. (*See id.* at 22; Doc. No. 46-1 at 15). The rotation lasted for a few months; Gargas says two, Estes Express says four. (*See* Doc. No. 49 at 20 (citing Doc. No. 45-1 at 48); Doc. No. 55 at 17 (citing Doc. No. 50-3 at 9-12)).

After hearing all combo drivers in the Toledo terminal would be required to temporarily cover nighttime linehaul runs, Gargas says he approached Benschoter to discuss the issue. (Doc. No. 48-1 at 106, 110). Gargas says he told Benschoter "[t]hat I needed to stay on days, I'm on medicine from the accident, my disability, and I need to continue to do, you know, the same thing," but Benschoter dismissed his concerns. (*Id.* at 113). Benschoter denies knowing about Gargas's SVT, his medication, or Gargas's 2017 injury and denies ever discussing these topics with Gargas. (Doc. No. 46-1 at 21-22).

Then, Gargas says, he approached Lamb and made the same request: to be exempted from the nighttime linehaul rotation because he was on "heart medication." (Doc. No. 48-1 at 114).

Lamb denies knowing Gargas had a heart condition, denies knowledge of Gargas's medication, and denies Gargas requested a modified work schedule from him at this time.  (Doc. No. 47-1 at 15-16).

During the conversation with Lamb, Gargas says Lamb suggested he put his name on the Toledo terminal "wish list" for P&D jobs.  (Doc. No. 48-1 at 118-119).  The "wish list" is an informal system for Estes Express employees to request lateral job changes—for example, "combo drivers that want to become P&D drivers."  (Doc. No. 47-1 at 23-24).  Each terminal has a paper wish list in the manager's office, and employees can sign their names and list their job preferences to be considered for an open position.  (*See id.*; Doc. No. 48-1 at 118).

Gargas says he signed the Toledo terminal's wish list to request a P&D job shortly after his conversation with Lamb.  (Doc. No. 48-1 at 119).  Lamb indicated he "possibly could have" encouraged Gargas to sign the wish list.  (Doc. No. 47-1 at 2).  Benschoter, too, acknowledged the existence of the wish list, but he testified that Gargas's name was not on the Toledo terminal list. (*See* Doc. No. 46-1 at 49).  These wish lists are usually discarded on a regular basis after existing open positions are filled.  (Doc. No. 47-1 at 25-26; Doc. No. 46-1 at 49).  Estes Express represented during a discovery hearing that the wish list from the Toledo terminal for the relevant time period had been destroyed and could not be produced.  (*See* Doc. No. 36 at 61-62).

### D.  GARGAS'S REMOVAL FROM WORK AND TERMINATION

Gargas's last week of work for Estes Express was the week of June 17, 2019.  (*See* Doc. No. 48-1 at 33).  On Wednesday, June 19, Gargas's primary care physician, Dr. Jay Nielsen, filled out a Physical Requirements form for Gargas indicating which job duties Gargas could and could not perform.  (*See* Doc. No. 42-3 at 2).  The June 19 Physical Requirements form lists the job responsibilities for the combo driver position and gives an evaluating physician two choices: "the above employee may safely perform all of the above job functions," or "the above employee cannot safely perform all or some of the above job functions," with a space for the physician to list those

job functions. (Doc. No. 48-13 at 1). Dr. Nielsen crossed out the job functions "must be able to be present at work as schedules and business needs require" and "must be able to remain alert during entire shift and must be able to work at a minimum full time" and wrote "No" next to each requirement. (*Id.*).

The next day, Dr. Nielsen sent the June 19 Physical Requirements form to Estes Express. (*See* Doc. No. 42-3). Accompanying the form was a note stating Gargas had informed Dr. Nielsen that Gargas "may be required to start driving on the night shift." (*Id.* at 1). Dr. Nielsen then wrote:

> Robert is very clearly a morning person. He rises early and by 9 o'clock night is in there, asleep and finds sleep unavoidable.
>
> At 50 years of age, he is exactly the person who will not tolerate a major change in circadian rhythm.
>
> For your own liability, and for the safety of my patient and the general public, we should not take him off of daytime driving until we have done a sleep deprivation sleep study to prove his safety. Even that testing will not prove safe at night with absolute surety.

(*Id.*). Senior Director of Compliance for Employee Relations Tracy Hughes received and read this letter. (Doc. No. 43-1 at 180). Hughes oversaw the various aspects of human resources at Estes Express, including the resolution of employee complaints, hiring, firing, discipline, and enforcing company policies and procedures. (Doc. No. 43-1 at 21-22).

When Gargas came into work on Friday, June 21, 2019, the day after Dr. Nielsen sent his letter, Benschoter told him he would be "working the dock that day . . . until we get this all resolved." (Doc. No. 48-1 at 60; Doc. No. 46-1 at 45). After that, Benschoter began communicating via email about the situation with Lamb, Hughes, Regional Safety Director Jeff Torman, and Director of Risk Management Janice Beacham. (*See* Doc. No. 46-2). Beacham oversaw Torman in the Risk Management department which, among other things, made determinations about when employees with work restrictions were safe to return to work. (*See* Doc. No. 43-1 at 127).

8

Initially, Hughes directed Benschoter to "allow Mr. Gargas to work the dock while he received his sleep study so we could assure he was safe to drive." (*Id.* at 9). But when Lamb discovered the only available dock work started at 2:00 am, Gargas balked. (*See id.* at 8; Doc. No. 43-1 at 117; Doc. No. 48-1 at 172). Because his supervisors "did not understand what [he] was asking," Gargas went back to Dr. Nielsen and asked him to clarify his letter. (Doc. No. 48-1 at 172). Dr. Nielsen did so on June 24, 2019, sending Estes Express an updated version of his June 20 note that included nearly identical language except that it now asked Estes Express not to "take him off daytime driving *of trucks or equipment*." (Doc. No. 42-4) (emphasis added).

With this updated work restriction in hand, Lamb, Benschoter, Torman, Beacham and Hughes debated what to do on June 25 and 26, 2019. (*See* Doc. No. 46-2). When Lamb explained Gargas "can[]not work nights at all" and asked for general guidance, Torman responded: "We cannot accommodate. If he cannot drive at night, then he cannot drive." (*Id.* at 5). Beacham agreed. (*Id.*). Because no dock work was then available during the day, Hughes confirmed Gargas was "out until we have the sleep study results or until something becomes available on the dock during the day that allows us to accommodate his restrictions." (*Id.* at 8).

Other evidence complicates the timing and source of the dictate that Gargas be removed from eligibility as a combo driver. Lamb testified he and Benschoter probably made the decision together with Torman. (Doc. No. 47-1 at 31-32). An email Lamb sent on June 25, 2019, states "*I took him out of service for now.*" (Doc. No. 46-2 at 5) (emphasis added). Benschoter testified he was not involved in the decision to take Gargas out of service and that Torman, and not Lamb, made the decision to take Gargas out of service. (Doc. No. 46-1 at 71). And an email sent by Benschoter on June 26 indicates he "ha[d] talked to Mr. Gargas," though it does not say when, and told him "as of right now he was out of service." (Doc. No. 46-2 at 1). Thus, while the exact timing

9

is unclear, Estes Express personnel made the decision to remove Gargas from work sometime between June 20 and June 26, 2019, while awaiting the completion of his sleep test.

Gargas used vacation time during the week of June 24, 2019.  (Doc. No. 48-1 at 60). Sometime that week, Gargas visited the Toledo terminal and spoke with Julie Rocha, the office manager.  (*See* Doc. No. 48-1 at 46-47).  According to Gargas, Rocha informed him he "needed to get on FMLA immediately and provided [him] the paperwork to do it."  (*Id.* at 47).  Gargas testified he "didn't understand why they wanted me on FMLA when I could continue to work every day," but he agreed, and Rocha submitted the relevant paperwork on his behalf on June 28, 2019.  (*Id.* at 47, 158; *see* Doc. No. 48-10).  The paperwork pegged Monday, June 24, 2019, as the start date of Gargas's leave, listed the reason for the leave as "sleep test," and did not list an anticipated return date.  (Doc. No. 48-10).

Gargas testified he spoke to Torman on the phone on Wednesday, June 26, 2019, and Torman told him he was "out of service" and could not work as a combo driver.  (Doc. No. 48-1 at 33-34, 61).  Gargas says he explained to Torman "in detail what had been going on with my Family Medical Leave and my SVT and my disability not to be able to drive at night, and he really didn't want to hear any of it."  (Doc. No. 48-1 at 33).  In response, Gargas says, Torman told him "if [you] cannot ever drive at night . . . [you] will no longer work for [me], no longer work for Estes."  (*Id.* at 34).

A few days later, on July 2, 2019, Dr. Nielsen filled out a health care provider certification for Gargas's FMLA leave where he stated Gargas "can't stay awake at night" and "can't work nights."  (Doc. No. 48-12 at 2, 4).  He estimated the leave onset date as June 20, 2019, and did not provide an end date.  (*Id.* at 3).  Gargas provided this form to Rocha.  (Doc. No. 48-1 at 167-68). Then, on July 14, 2019, Gargas submitted a formal request for FMLA leave to Estes Express through Rocha, listing his last day worked as June 21, 2019, indicating he was taking leave "for a

serious health condition that makes me unable to perform the essential functions of my job," and requesting approval for leave from June 22, 2019 to July 16, 2019. (Doc. No. 48-11 at 1-2; Doc. No. 48-1 at 165).

On the night of July 16, 2019, Gargas underwent a Maintenance of Wakefulness Test—his "sleep test"—which measures a person's ability to stay awake "during four 20 minute periods." (Doc. No. 42-5 at 1). The first period began at 10:21pm on July 16, the second began at 12:27am on July 17, the third began at 2:22am on July 17, and the fourth began at 4:27am on July 17. (*Id.*) On August 11, 2019, the administering doctor, Dr. Fateh Ahmed, concluded, "the MWT is abnormal suggestive of excessive daytime sleepiness (hypersomnia)." (*Id.* at 2). Gargas says Dr. Nielsen told him he did not have hypersomnia, and Gargas also says he never experienced "daytime sleepiness." (Doc. No. 48-1 at 182-183).

Around this time, at the end of July and beginning of August, the Toledo terminal filled four new P&D positions. (Doc. No. 46-1 at 96-97). Benschoter testified Gargas's name was not on the wish list at this time, but he also testified that Gargas was not eligible for any of these jobs at this time "because he was out of service" and was not "an active employee." (*Id.* at 97).

Gargas spoke with Rocha after the "sleep test," and she indicated personnel at Estes Express wanted Dr. Nielsen to explain the test results. (Doc. No. 48-1 at 183). Two weeks after receiving the test results, on August 23, 2019, Gargas received approval for a period of FMLA leave from June 24, 2019 to July 24, 2019. (Doc. No. 43-15 at 1). That same day, Estes Express sent a letter to Gargas asking him to "recertify [his] absence" by having his physician submit an updated medical certification form. (Doc. No. 42-7).

On September 3, 2019, Dr. Nielsen sent a letter to Estes Express containing an updated Physical Requirements Form, a medical certification form, and a response to the "sleep test." (*See* Doc. No. 43-20; Doc. No. 42-6). The Physical Requirements form listed the same job functions for

the "combo driver" position and listed the same two options for Dr. Nielsen to select.  (Doc. No. 43-20 at 1).  This time, Dr. Nielsen checked the box "[t]he above employee cannot safely perform all or some of the above job functions" and wrote "daytime only."  (*Id.*).  The medical certification form, meanwhile, is a copy of the July 2, 2019 form, except the date has been crossed out at the bottom and replaced with September 3, 2019.  (*Id.* at 6).

In his letter about the "sleep test," Dr. Nielsen contested its results.  (*See* Doc. No. 42-6).  He wrote: "This patient like most people does not adapt well to night shift and cannot stay awake past expected hours of sleep . . . He does not have any pathology.  Not being able to stay awake at night is NORMAL!!!!!!!!!!!!!  [N]ow the employer wants a diagnosis when there is none."  (*Id.*).  Dr. Nielsen listed Gargas's diagnosis as "[n]ormal adult male with normal response to failing to sleep at night."  (*Id.*).  He further opined, "[t]his patient may not safely work night shift as we have proven."  (*Id.*).  On September 5, 2019, Dr. Nielsen sent a follow-up letter to Estes Express clarifying Gargas's work restriction: "This patient can work from five or 6 o'clock in the morning until 10 PM at night and not restrict actual daytime hours meaning daylight hours."  (Doc. No. 42-10).

After the sleep test, on September 10, 2019, Gargas faxed Estes Express a request for reinstatement.  (*See* Doc. No. 42-11).  Gargas explained he had "presented medical to Estes Trucking confirming I had a medical condition which precluded night time driving" and that he "had no other driving restrictions."  (*Id.*).  He stated he had "submitted updated medical on 9-4-19 confirming that I could work from 5:00 or 6:00am to 10:00PM daily in my driving position without restrictions."  (*Id.*).  Then Gargas asked, "pursuant to my approved FMLA leave" to be "reinstated to my position."  (*Id.*).  Hughes confirmed that she received and read this fax.  (Doc. No. 43-1 at 216-17).  Soon after, Amy Barlow, in Estes Express's Benefits Department, left Gargas a voicemail explaining, "we are not able to reinstate you to your position of combo driver with the restrictions

of daytime only, as being a combo driver, you must be available for any hub or line-haul or P&D run that is needed." (Doc. No. 43-1 at 220).

Around this time, Gargas says he also spoke with Mick McMahon, a member of Estes Express's human resources department, and asked to be reinstated several times. (*See* Doc. No. 48-1 at 51-55; Doc. No. 48-21). Gargas says McMahon told him repeatedly that he "didn't have any work" for Gargas, and Gargas "felt it was over this disability that he's not bringing me back to work." (Doc. No. 48-1 at 54-55). Eventually, Gargas contends, McMahon told him, "they might hire you to be a switcher, a yard switcher, and you need to -- with your qualifications, you have to apply." (*Id.* at 57). A "yard switcher" or "jockey" is responsible for positioning empty trailers near the dock at the terminal so they can be loaded with freight. (Doc. No. 43-1 at 44-45).

Gargas did not apply, citing his understanding that the "jockey yard job is already part of the [combo] job" and expressing confusion over being asked "to apply for a job when I already have the job." (*Id.* at 57-58). Estes Express takes a different view, as Hughes testified in her Rule 30(b)(6) deposition that Gargas was offered this jockey position and that the requirement to submit an application was a mere formality. (*See* Doc. No. 43-1 at 192-93).

After these events in September, neither Estes Express nor Gargas took actions related to Gargas's employment with Estes Express for five months. Gargas, believing he had already been fired because Estes Express would not return him to work, began looking for other jobs. (Doc. No. 48-1 at 78). Then, on February 25, 2020, Hughes sent Gargas a letter informing him he was terminated. (Doc. No. 43-21 at 2). After describing post-employment benefits for which Gargas would be eligible, the letter stated, "[b]ased on our recent conversation there is no reasonable accommodation that can be offered . . . [y]our employment with the company will end on February 25, 2020." (*Id.*). Internally, Estes Express characterized Gargas's termination as being for "nonavailability." (*Id.* at 1).

### III.    STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the [record] . . . ,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.* at 323-25.

Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position.  *Celotex*, 477 U.S. at 324; *see also Harris v. Gen. Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party."  *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  But "'at the summary judgment stage the judge's function is not

14

himself to weigh the evidence and determine the truth of the matter.'" *Wiley v. United States*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249). Therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).

Ultimately, I must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000). And these "same standards" apply where, as here, both parties move for summary judgment. *Reform America v. City of Detroit*, 37 F.4th 1138, 1147 (6th Cir. 2022) (courts must "evaluate the respective motions on their own merits, keeping in mind that a trial may be appropriate still") (citations omitted).

## IV.    ANALYSIS

### A.    GARGAS'S MOTION TO DISREGARD

As a preliminary matter, I must address Gargas's second motion, styled "Plaintiff's Motion to Strike," asking me to disregard paragraphs 13, 14, 15, 16, and 23 of the First Declaration of Tracy Hughes. (Doc. No. 58; *see* Doc. No. 50-3).[2]

Hughes was previously deposed as Estes Express's Rule 30(b)(6) designee, and Gargas argues portions of her later declaration "directly conflict[] with her prior testimony as Defendant's 30(b)(6) corporate designee, . . . lack[] personal knowledge, and . . . contain[] hearsay." (Doc. No. 58

---

[2]  The Declaration to which Gargas objects was attached as an exhibit to Estes Express's motion for summary judgment. (Doc. No. 50-3). In its response in opposition to Gargas's motion for summary judgment, Estes Express attached a second Declaration of Tracy Hughes addressing different matters. (Doc. No. 55-1). Gargas does not object to the Second Hughes Declaration.

at 1; *see* Doc. No. 43).  Estes Express argues Gargas's motion is actually an impermissible reply brief and, in the alternative, that the Hughes Declaration is consistent with her testimony as Gargas's Rule 30(b)(6) designee, does not contain hearsay, and is based on her personal knowledge.[3]  (Doc. No. 59 at 2-3).  Because the parties filed cross-motions for summary judgment in this case, I prohibited them from filing any reply brief without leave of court.  (*See* Minute Order, Feb. 13, 2023).  Gargas did not request leave to file a reply brief, so I will evaluate his arguments only to the extent they address whether portions of the First Hughes Declaration should be disregarded.

To show that a fact "cannot be or is genuinely disputed," a party may cite "to particular parts of materials in the record, including . . . affidavits."  Fed. R. Civ. P. 56(c)(1).  An affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  A court should disregard "portions of summary judgment affidavits that do not satisfy the requirements of Rule 56."  *Francis v. ProMedica Health Sys., Inc.*, 601 F. Supp. 3d 258, 262 (N.D. Ohio 2022) (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir. 2009)).

When considering a deponent's post-deposition affidavit, a court "must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony."  *Aerel S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 908 (6th Cir. 2006).  If so, those contradictory portions must be disregarded "unless the party opposing summary judgment provides a persuasive

---

[3]  Estes Express also argues Gargas's motion is "not permitted under the Rules or Sixth Circuit precedent" because, in the Federal Rules of Civil Procedure, a "motion to strike" can only be aimed at pleadings, and a declaration is not a pleading.  (Doc. No. 59 at 2) (citing *Reed v. City of Memphis*, 735 F. App'x 192, 197 (6th Cir. 2018)).  But as Estes Express concedes, "when a portion of an affidavit does not comport with Rule 56," the Rule requires a court to "disregard that portion." *Reed*, 735 F. App'x at 197; (*see* Doc. No. 59 at 2).  In substance, Gargas's motion asks that I disregard portions of the Hughes Declaration because those portions do not comply with Rule 56(c)(4)'s requirements for affidavits.  (*See* Doc. No. 58 at 3).  So, although Gargas's use of the phrase "motion to strike" may be imprecise, I will evaluate his arguments in the context of Rule 56(c)(4)'s requirements for affidavits used at summary judgment.

justification for the contradiction." *Id.*; *see Upshaw*, 576 F.3d at 593 (a court must only disregard the "*inadmissible* portions" of an affidavit) (emphasis original). If there is no "direct contradiction," a court must not disregard portions of a post-deposition affidavit "unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Aerel S.R.L.*, 448 F.3d at 908 (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)). Because this rule does not prevent "a party who was not directly questioned about an issue from supplementing incomplete deposition testimony" with a later affidavit, courts "construe whether the affidavit directly contradicts prior deposition testimony narrowly." *Johnson v. Ford Motor Co.*, 13 F. 4th 493, 501 (6th Cir. 2021) (quoting *Aerel S.R.L.*, 448 F.3d at 907) (internal quotation marks omitted).

In determining whether an affidavit attempts to create a sham factual issue, courts consider (1) whether the affiant was cross-examined during the earlier testimony, (2) whether the affiant had access to the pertinent evidence during the earlier testimony or, instead, whether the affidavit was based on newly-discovered evidence, and (3) whether the earlier testimony reflects confusion that the affidavit attempts to explain. *Johnson*, 13 F. 4th 493, 501 n.6 (6th Cir. 2021) (citing *Aerel S.R.L.*, 448 F.3d at 909).

Even then, a post-deposition affidavit must independently satisfy the requirements of Rule 56. While statements made on the basis of personal knowledge are admissible, "statements made on belief or 'on information and belief,' cannot be utilized on a summary-judgment motion." *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015) (quoting 10B Wright, Miller & Kane, *Federal Practice and Procedure* § 2738 at 345 (3d ed. 1998)) (internal quotation marks omitted). A district court "has discretion to determine whether it can differentiate between knowledge and belief for each averment in the affidavit." *Ondo*, 795 F.3d at 605. If so, the statements based on knowledge must be considered and those based on belief must be disregarded. *Id.* "If the court cannot differentiate between the two . . . the court must strike the affidavit in its entirety." *Id.*

17

Finally, the "admissibility in evidence" requirement allows a court to disregard facts that would not be admissible under the Federal Rules of Evidence.  *See Bailey v. Youth Vills., Inc.*, 239 F.R.D. 483, 486-89 (M.D. Tenn. 2006) (considering whether the Federal Rules of Evidence barred the consideration of portions of three affidavits).

> 1.      **Paragraph 13**

Paragraph 13 of the Hughes Declaration states:

> Any time an employee reports having a driving restriction, the restriction is provided to Estes' Safety Department for review to put the public's safety and the employee's safety first. In addition, Estes' Human Resources Department conducts an individualized assessment to determine whether a reasonable accommodation is available that will allow the employee to perform the essential functions of the job.

(Doc. No. 50-3 at 7).

Gargas argues this directly contradicts Hughes's Rule 30(b)(6) testimony because it "paints an entirely new and benign picture" of the way Estes Express handled Gargas's request for an accommodation by "generally outlin[ing] what it *should have done*" and implying that is what Estes Express did.  (Doc. No. 58 at 7) (emphasis original).  In response, Estes Express asserts that "paragraph 13 recites Estes' policy" and does not contradict Hughes's prior testimony on this point. (Doc. No. 59 at 3).

In the relevant section of Hughes's Rule 30(b)(6) testimony, Hughes is asked, "what does Estes do *generally* to see if an accommodation is available?"  (Doc. No. 43-1 at 54) (emphasis added). She answered, in part, "[t]here is an individualized assessment each time there is a review of an accommodation."  (*Id.* at 54-55).  The generalized language of the first sentence of paragraph 13— "any time an employee reports"—likewise refers to a general policy or practice.  Because the parties agree that paragraph 13 is no more than a recitation of the policy regarding accommodations Estes Express purports to have followed, it does not contradict Hughes's nearly identical Rule 30(b)(6) testimony on this point.  Gargas makes no argument why this statement might otherwise create a

sham fact issue, and I find none.  (*See* Doc. No. 58 at 7).  Further, because Estes Express's accommodation policy was one of the topics Hughes personally prepared to discuss at the Rule 30(b)(6) deposition, her recitation of this policy in the affidavit was based on her personal knowledge.  (*See* Doc. No. 43-2).  I will not disregard paragraph 13 of the First Hughes Declaration.

       **2.**       **Paragraph 14**

Gargas objects to three assertions in paragraph 14: (1) "Estes has never permitted any tractor-trailer driver for any reason to drive a tractor-trailer with a work restriction that is the same or similar to Plaintiff's restriction, *i.e.* not driving between the hours of 9:00 p.m. or 10:00 p.m. at night until 5:00 a.m. or 6:00 a.m. in the morning"; (2) "all of Estes' driver classifications are required to drive linehaul (nighttime) runs as business needs dictate, and . . . Estes cannot guarantee a driver will be back at the terminal and off the road every shift by 10:00 p.m."; and (3) "P&D drivers . . . will be required to drive linehaul (over-the-road) runs as business needs dictate . . . typically between the hours of 7:00 p.m. to 7:00 a.m."  (Doc. No. 58 at 9) (quoting Doc. No. 50-3 at 7-8) (emphasis removed).

Gargas argues these statements should be disregarded because they are new assertions that conflict with Hughes's Rule 30(b)(6) testimony about the nature of Gargas's work and with other evidence that exists in this case.  (Doc. No. 58 at 9).  But these statements do not contradict Hughes's testimony.  And they do not seek to create a sham factual issue.

For the first statement, about Gargas's work restriction, Gargas argues that "[a] post-deposition affidavit's new assertion, filed after the close of discovery . . . cannot be considered in deciding a motion for summary judgment."  (*Id.*).  But the case he cites, *Myers v. Huron County*, No. 3:06-CV-3117, 2008 WL 271657 (N.D. Ohio Jan. 31, 2008), says no such thing.  There, the plaintiff's "new assertion" in a post-deposition affidavit directly contradicted his deposition testimony because he was asked to list allegedly retaliatory incidents and failed to list the incidents he

later tried to add into the record through his post-deposition affidavit. *See Myers*, 2008 WL 271657 at *2 n.2; *cf. Arthur v. American Showa, Inc.*, 625 F. App'x 704, 710-11 (6th Cir. 2015) (concluding that a new statement in a declaration did not contradict prior deposition testimony because the declarant "was never asked" about the incident in question).

Gargas does not point to any analogous passage in Hughes's Rule 30(b)(6) deposition, and he does not otherwise explain why Hughes's statement contradicts her deposition testimony or creates a sham issue of fact. Further, the *Aerel* rule permits a deponent to "supplement[] incomplete deposition testimony with a sworn affidavit." *Johnson*, 13 F.4th at 501 (quoting *Aerel S.R.L.*, 448 F.3d at 907) (internal quotation marks omitted). The introduction of new information into the record is an unavoidable consequence of allowing a deponent to "supplement" deposition testimony in this way.

Similarly, Hughes's statement that all driver classifications must drive linehaul runs as business needs dictate, and her statement that Estes Express cannot guarantee a driver will be off the road before 10:00pm, do not contradict her deposition testimony. Hughes testified, "We cannot guarantee that a driver is not going to drive into the night or at night . . . if there is a breakdown, if there's bad weather, if there is an accident." (Doc. No. 43-1 at 142). She also testified, "all driving positions drive at night . . . or have the ability to drive in the night." (*Id.* at 223). These passages are not word-for-word copies of the statements in paragraph 14 of the First Hughes Declaration, but they are consistent with them. Thus, these passages in paragraph 14 also do not contradict Hughes's deposition testimony. Further, Gargas makes no specific argument as to why these statements, which do not contradict Hughes's deposition testimony, might nevertheless be an attempt to create a sham issue of fact.

Finally, regardless of whether Hughes's contention about the 7:00pm to 7:00am driving hours is inconsistent with other evidence in this case, it does not contradict her earlier testimony. In

fact, during her deposition, Hughes insisted that Gargas, as a combo driver, was required to drive linehaul and did in fact drive linehaul. (Doc. No. 43-1 at 142-44). She also testified that "line-haul runs at night," that "when they're running in line-haul, you're running at night," that linehaul runs occurred "during the middle of the night," and that linehaul required "working night and early morning." (*Id.* at 97, 184, 194). Hughes was never asked for a specific hourly range typical of linehaul runs. Providing one in a subsequent affidavit "clarif[ies] the record" and does not create a sham issue in an attempt to "stave off summary judgment." *Cossairt v. Jarrett Builders, Inc.*, 292 F. Supp. 3d 779, 783 (M.D. Tenn. 2018) (considering a post-deposition affidavit that "is generally consistent with, and an amplification of" prior deposition testimony). I will not disregard the statements in paragraph 14.

### 3.     Paragraph 15

As relevant here, paragraph 15 states, "Plaintiff was taken out of service on or about June 21, 2019 by the Safety Department . . . Janice Beacham, Director in Risk Management, Safety Department, removed Plaintiff from Estes' approved driver list due to this work restriction." (Doc. No. 50-3 at 8). To show Hughes's personal knowledge of these assertions, Hughes's declaration cites to an email from Beacham to Hughes where Beacham states, "we will remove him from the approved driver list." (*See* Doc. No. 50-3 at 46). Gargas argues Hughes's statement about who took Gargas out of service should be disregarded because Hughes lacks personal knowledge on this issue and, further, because this statement contradicts her deposition testimony. (Doc. No. 58 at 10). I agree that Estes Express has failed to establish Hughes had personal knowledge with respect to both statements.

To satisfy Rule 56(c)(4), "it must be evident from the affidavit that the facts contained therein are based on personal knowledge." *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F. Supp. 2d 948, 956 (S.D. Ohio 2000). This is because "[a] witness may testify to a matter only if evidence is

introduced sufficient to support a finding that the witness has personal knowledge of the matter."

Fed. R. Evid. 602.  A person has personal knowledge of a fact if they "have had an opportunity to

observe, and [] have actually observed the fact."  Fed. R. Evid. 602 advisory note to the committee's

1972 proposed rules (quoting McCormick on Evidence § 10 p.19) (internal quotation marks

omitted).

As applied to hearsay, Rule 602 allows a witness to testify "to a hearsay statement as such,"

as long as she "has personal knowledge of the making of the statement."  Fed. R. Evid. 602 advisory

note to the committee's 1972 proposed rules.  But Rule 602 "prevent[s] [her] from testifying to the

*subject matter* of the hearsay statement, as [she] has no personal knowledge of it."  *Id.* (emphasis

added); *see* Fed. R. Evid. 801, 802 (generally prohibiting the introduction into evidence of an out-of-

court statement when used to show the truth of the matter asserted).  Put another way, a witness

cannot claim to have personal knowledge of a fact based solely on another person's hearsay

statement asserting the truth of that fact.

This is what Hughes attempts to do in Paragraph 15 of her declaration.  That paragraph

makes two assertions about an employment decision ostensibly made by others in a different

department of Estes Express—and not involving Hughes herself.  (*See* Doc. No. 50-3 at 8).  While

Beacham told Hughes, via email, that she (or other members of the Safety Department) "will" take

Gargas out of service, Hughes did not personally observe the making and execution of that decision.

(Doc. No. 50-3 at 46).  This email is hearsay because it is an out-of-court statement, and Hughes

attempts to use it to show that Beacham and the Safety Department *did in fact* take Gargas out of

service.  *See* Fed. R. Evid. 801.  As the advisory note to Rule 602 makes clear, a hearsay statement

like Beacham's email cannot be used as the basis for Hughes's personal knowledge.  *See* Fed. R.

Evid. 602 advisory note to the committee's 1972 proposed rules.

Estes Express argues the email itself would be admissible in evidence for "the effect on the listener" because it shows why Hughes believed she was unable to offer Gargas driving positions as alternative accommodations.  (*See* Doc. No. 59 at 12 (citing *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009)).  Even if true, this does not show Hughes has personal knowledge of the decision to take Gargas out of service, as Rule 56 requires.

As I explained above, in order for Hughes's assertions in Paragraph 15 to be admissible as evidence of who actually took Gargas out of service, Hughes must show she has knowledge of that decisionmaking based on her firsthand observations and perceptions.  *See* Fed. R. Evid. 602.  After reading the email from Beacham, Hughes may indeed have formed beliefs about what Beacham and the Safety Department did or did not do.  But because a third-party's out-of-court statement, and not Hughes's personal observations, forms the basis for this belief, she cannot use the email to show she has personal knowledge of when and how Gargas was taken out of service.  *See Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000) (disregarding statements in an affidavit "because they were not made with Plaintiff's personal knowledge, or were otherwise based on hearsay").  Because the email from Beacham does not establish Hughes's personal knowledge, and because Estes Express points to no other source of evidence to show Hughes had personal knowledge, I will not consider her assertions in Paragraph 15 about the decision to take Gargas out of service.

### 4.    Paragraph 16

Paragraph 16 makes assertions about a conversation between McMahon and Gargas regarding an open position as a jockey along with an assertion that Estes Express "offered" the position to Gargas.  (Doc. No. 50-3 at 8-9).  Gargas objects to the consideration of Paragraph 16 on the grounds that Hughes had no personal knowledge of the conversation between Gargas and McMahon regarding the jockey position and, further, that Hughes's contention she "offered" Gargas the jockey position contradicts her previous deposition testimony.  (Doc. No. 58 at 12-13).

As the basis for her personal knowledge of this conversation and the alleged accommodation, Hughes points to two email chains including her, Beacham, and McMahon where they discussed Gargas's employment.  (*See* Doc. No. 50-3 at 44-45).

I reject Gargas's arguments about the statement that Estes Express "offered" Gargas the jockey position as an accommodation.  First, the exhibit Hughes cites establishes Hughes had personal knowledge about the alleged accommodation, because it includes an email where Hughes writes, "*[w]e* have a jockey position open that we *are offering* as an accommodation."  (*Id.* at 46) (emphasis added).  Unlike the email cited above in Paragraph 15, in which a third-party communicates their intent to make a decision to Hughes, the email cited in Paragraph 16 is a record of an action Hughes purportedly took herself.  So, this is a proper basis for Hughes's personal knowledge.  *See* Fed. R. Evid.

Second, Hughes's declaration does not "directly contradict" her 30(b)(6) deposition testimony.  *France v. Lucas*, 863 F.3d 612, 622 (6th Cir. 2016).  The Sixth Circuit "narrowly defines the term 'direct contradiction:'" as long as two statements "can simultaneously be true," they are not "directly contradictory."  *Francis v. ProMedica Health Sys., Inc*, 601 F. Supp. 3d 258, 262 (N.D. Ohio).  In her 30(b)(6) deposition testimony, Hughes stated: "[w]e said we have a jockey position that we are offering, you just need to go into Brass Ring to apply for that position."  (Doc. No. 43-1 at 195).  Read in context, the statement in Paragraph 16 that Estes Express "offered" Gargas a jockey position is consistent with this testimony because Hughes testified that Estes Express *first* offered Gargas the jockey position, and *then* told him how to acquire it.  I note that the parties disagree on whether Gargas actually was offered the jockey position, as a factual matter.  (*See* Doc. No. 50-1 at 28-29; Doc. No. 54 at 18).  But it can simultaneously be true that Estes Express "offered" Gargas the jockey position and that Estes Express "said we are offering" the jockey position.  So, the statement in Paragraph 16 does not directly contradict Hughes's testimony.  Lacking any direct

contradiction, and absent an argument from Gargas that the declaration is an attempt to create a sham fact issue, I will consider the assertion in Paragraph 16 that Estes Express "offered" Gargas the jockey position.

But the email chain Hughes cites in her declaration does not mention any conversation between Gargas and McMahon, and Hughes provides no other basis for her personal knowledge of the contents of a phone conversation between two third-parties. I will disregard the statement in Paragraph 16 about the conversation between McMahon and Gargas but will otherwise consider this paragraph.

### 5. Paragraph 23

Finally, Gargas objects to the following portion of Paragraph 23: "Plaintiff informed Ms. Bowie that he could not work at night and he provided her no date when he would be able to, or expected to be able to, work at night, an essential function of his combo driver position." (Doc. No. 58 at 14 (citing Doc. No. 50-3 at 13)). He reads this passage to assert Gargas told Bowie that working at night was an essential function of the combo driver position. (*See id.*). But read in context, the clause "an essential function of his combo driver position" is Hughes's (or Estes Express's) editorialization on the importance of nighttime work as a job function. It is an "unsubstantiated legal conclusion," not an assertion of fact. *Giles v. Univ. of Toledo*, 241 F.R.D. 466, 471 (N.D. Ohio); *see, e.g.*, *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854-55 (6th Cir. 2018) (laying out the "essential function" test in disability discrimination cases). Accordingly, I will disregard the characterization of working at night as an "essential function of the combo driver position" in the First Hughes Declaration.

### 6. Summary

For the reasons above, I will disregard the assertion about the decision to take Gargas out of service in Paragraph 15, the reference to the content of Mick McMahon's phone call with Gargas in

Paragraph 16, and the characterization of working at night as an essential function of the combo driver position in Paragraph 23.  Otherwise, I will consider the First Hughes Declaration, along with the other record evidence.  Gargas's motion, (Doc. No. 58), is granted in part and denied in part.

### B.  PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Both parties move for summary judgment on all claims.  (*See* Doc. No. 49; Doc. No. 50-1).

### 1.  Ohio Law Disability Discrimination Claims

Gargas brings two separate disability discrimination claims under Ohio law: one for Estes Express's alleged failure to accommodate his disability, and one for other adverse actions Estes Express allegedly took because of Gargas's disability.  (*See* Doc. No. 1 at 9-11).  Ohio courts generally apply the law of the ADA when analyzing disability discrimination claims under Ohio law, except when a provision of Ohio law is "different from the analogous" ADA provision.  *Genaro v. Cent. Transp., Inc.*, 70 N.E.2d 782, 787 (Ohio 1999); *see Scalia v. Aldi, Co.*, No. 25436, 2011 WL 6740756 at *7 (Ohio Ct. App. 2011).

### a.  Disparate Treatment Claim

Under Ohio law, an employer is prohibited from discriminating against an employee because of their disability.  *See* Ohio Rev. Code § 4112.02(A).  A "disability" is "a physical or mental impairment that substantially limits one or more major life activities . . . a record of a physical or mental impairment; or being regarded as having a physical or mental impairment."  Ohio Rev. Code § 4112.01(13); *see* 42 U.S.C. § 12102(1) (defining "disability" under the ADA to include a physical or mental impairment that substantially limits a major life activity, a record of an impairment, or being regarded as having an impairment).  Gargas asserts both "disabled" and "regarded as disabled" theories of discriminatory treatment.  (*See* Doc. No. 49 at 29-34). [4]  Either theory can be proven by

---

[4]  Gargas does not argue he had a "record of a physical or mental impairment."  (*See* Doc. No. 49 at 33-34).

direct or circumstantial evidence; Gargas does not argue there is direct evidence of discriminatory treatment on the basis of an actual or perceived disability.  (*See id*.).[5]

The familiar *McDonnell Douglas* burden-shifting framework governs this inquiry.  First the employee must make a *prima facie* case of disability discrimination by showing that: "1) he [] is disabled; 2) [he is] otherwise qualified for the position, with or without reasonable accommodation; 3) [he] suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced."  *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016) (internal citations and quotation marks omitted).  Then, the burden of production shifts, and the employer must identify a legitimate, non-discriminatory reason for their employment action.  *See id*.  Finally, the employee must provide evidence that the employer's articulated reason is really a pretext for unlawful discrimination.  *See id*.

As I noted above, an employee may prove disability discrimination under Ohio law where they are "regarded as having a physical or mental impairment" even if they do not in fact have a "physical or mental impairment that substantially limits one or more major life activities."  Ohio Rev. Code § 4112.01(A)(13); *see* 42 U.S.C. § 12102(3)(A).  If an employee shows the employer regarded them as disabled, they "must still show that their employer discharged them (or took some other form of adverse employment action against them) because of, or 'but-for,' their actual or

---

[5]  In the introductory paragraphs of his opening brief, Gargas asserts he is "proceeding under the direct evidence of discrimination route as all of the decision-makers admitted Estes has a 100% healed policy.  Specifically, Estes stated that if an employee has a work restriction, 'we cannot accommodate' regardless of his health condition/disability."  (Doc. No. 49 at 24).  But as the remainder of his brief makes clear, Gargas argues that Estes Express's supposed "100% healed policy" is direct evidence of his failure to accommodate claim.  (*See* Doc. No. 49 at 37-40).  He makes no argument this policy is direct evidence for his discriminatory treatment claim.  (*See id*. at 29-34).  In any case, I explain in my analysis of the pretext issue why Gargas's "100% healed policy" argument does not hold water.  So, to the extent Gargas argues there is direct evidence of his discriminatory treatment claim, I reject that argument for the reasons articulated below.

perceived physical or mental impairment." *Babb*, 942 F.3d at 308 (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc)).[6]

The parties dispute whether Gargas is disabled or regarded as disabled and whether he was otherwise qualified for his position. (*See* Doc. No. 49-1 at 31-34; Doc. No. 50-1 at 26-31). They also dispute whether Gargas can show Estes Express's articulated legitimate, non-discriminatory reason is pretextual. (*See* Doc. No. 55 at 26-31; Doc. No. 49 at 24). There is a genuine dispute of material fact as to each.

### i.    Disability and Knowledge of Disability

#### a.    *Disability*

To show he has a disability under the "physical impairment" prong of this definition, Gargas must offer evidence of a "physical or mental impairment" that "substantially limits" a "major life activit[y]." *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 299 (6th Cir. 2019) (quoting 42 U.S.C. § 12102(1)(A)). Estes Express does not dispute that SVT, a heart condition that affects the cardiovascular system, is a physical impairment. (*See* Doc. No. 55 at 27-28; Doc. No. 57 at 13). Instead, it argues Gargas cannot show his SVT substantially limits any major life activity. (*See* Doc. No. 50-1 at 26-27; Doc. No. 55 at 10-11).

To determine whether an impairment substantially limits one or more major life activities, the regulations implementing the ADA "direct courts to compare the person claiming a disability to 'most people in the general population.'" *Hostettler*, 895 F.3d at 853 (quoting 29 C.F.R. §

---

[6] As the Sixth Circuit has noted, the traditional five-part prima facie case "does not map neatly onto a 'regarded as' claim." *Babb*, 942 F.3d at 320 n.8. For example, "elements (1) and (4) [which require a showing that the employee was disabled and that their employer knew this] are already captured in the threshold inquiry into whether the employee has adduced evidence showing that their employer believed they had a 'physical or mental impairment.'" *Id.* And in determining whether an employee is "qualified" for a position, "inquiries into 'reasonable accommodations' are irrelevant." With these modifications, the traditional 3-part burden-shifting test applies to regarded-as-disabled claims. *See id.* at 320.

1630.2(j)(1)(ii).  This inquiry does not require a plaintiff to submit "scientific, medical or statistical proof."  *Morrissey*, 946 F.3d at 299.  Still, a plaintiff must "submit[] enough evidence to show that [he] is substantially limited" in at least one major life activity.  *Id.* at 300.

Gargas leans on the "expansive coverage" of Ohio's ADA-analogue and asserts: "Mr. Gargas' heart condition precludes him from working overnight in any job classification . . . because the disruption of his working hours risks heart palpitations, fluttering in his chest, shortness of breath, etc."  (Doc. No. 49 at 32-33).  In essence, Gargas argues his SVT substantially limits his ability to work because he cannot work at night.

"Working" is a major life activity under the ADA.  42 U.S.C. § 12102(2)(A).  "[A] plaintiff alleging a work-related disability must show that his condition precludes him from working in a *class* or *broad range* of jobs."  *Booth v. Nissan North America, Inc.*, 927 F.3d 387, 394 (6th Cir. 2019) (emphasis original).  The language used by the Sixth Circuit in *Booth* is similar to the formulation used by the Sixth Circuit prior to the 2008 amendments to the ADA.  *See Tinsley v. Caterpillar Fin. Servs. Corp.*, 766 F. App'x 337, 342 (6th Cir. 2019) (citing *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 317 (6th Cir. 2001)).

But the 2008 amendments to the ADA lowered the bar for plaintiffs to show they are disabled.  The statute now commands courts to interpret the term "substantially limits" to require "a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the [2008 Amendments]."  29 C.F.R. § 1630.2(j)(iv); *see Morrissey*, 946 F.3d at 299 (6th Cir. 2019) (explaining that the 2008 Amendments to the ADA "were enacted to respond to 'years of court decisions narrowly defining who qualifies as an individual with disabilities'" (quoting *Hostettler*, 895 F.3d at 848)).  So, while a plaintiff must explain how their impairment inhibits their ability to perform of a class or broad range of jobs, that impairment "'need not prevent, or significantly or severely restrict . . . a major life activity' to be substantially limiting."  *Hostettler*, 895 F.3d at 853-54.

Based on the available record evidence, there is a genuine dispute of fact over whether Gargas's SVT substantially limited his ability to work.  Some evidence favors Gargas.  Gargas testified he was not able to perform any job that required working at night or overnight because he "had the disability and [] needed to stay on daytime driving."  (Doc. No. 48-1 at 37-38).  Several of Dr. Nielsen's notes to Estes Express likewise suggest Gargas's SVT rendered him unable to work during the night in general, regardless of the position.  (*See* Doc. No. 42-10; Doc. No. 42-6).  Dr. Nielsen's September 3, 2019 note, for example, states: "[t]his patient may not safely work night shift, as we have proven."  (Doc. No. 42-6).  The note he sent two days later states he can work until "10PM at night and not restrict actual daytime hours meaning daylight hours."  (Doc. No. 42-10).  And Dr. Nielsen's note addressing the sleep study, while perhaps not crystal clear, attacks a result that likewise could benefit from further explanation: the conclusion that Gargas suffered from "excessive *daytime* sleepiness" following a test of Gargas's ability to remain awake "overnight."  (Doc. No. 42-5 at 1-2) (emphasis added).

In addition, Gargas's refusal to work on the dock overnight in a temporary capacity provides support for his contention that his SVT limited his ability to perform the class of jobs requiring nighttime work, and not just a single job.  (*See* Doc. No. 48-1 at 172).  Gargas also testified that after his departure from Estes Express, he sought jobs that did not require, or at least minimized, any night work.  (*See id.* at 72, 74-76, 80).  So, a reasonable jury crediting the most favorable version of Dr. Nielsen's notes and Gargas's testimony could find that Gargas's SVT prevented him from performing the class of jobs requiring night work.  *See Brumley v. United Parcel Serv.*, No. 3:20-cv-00222, 2021 WL 6496803 at *6 (M.D. Tenn. Aug. 9, 2021) (finding the plaintiff's disability substantially limited her ability to work where it precluded her from working "heavy lifting jobs"); *see also Chaniott v. DCI Donor Servs., Inc.*, 481 F. Supp. 3d 712, 722-23 (M.D. Tenn. 2020) (finding the

plaintiff's anxiety "interfered with his sleeping, thinking and working" where his anxiety symptoms were exacerbated by working the night shift).

Other evidence favors Estes Express. Dr. Nielsen's notes regarding Gargas's work restriction are inconsistent and are susceptible to more than one interpretation. In the same letter where he states Gargas "may not safely work night shift," Dr. Nielsen also states Gargas is a "[n]ormal adult male with a normal response to failing to sleep at night." (Doc. No. 42-6). And the precise restriction recommended by Dr. Nielsen changed from letter to letter, potentially undermining the reliability of those documents. (*See* Doc. Nos. 42-3, 42-4, 42-10). Gargas also testified he occasionally drove past 10:00pm in his personal life, *see* Doc. No. 48-1 at 153-54, and when asked about how his SVT affected his life, he testified he could engage in his regular hobbies, take care of himself, and otherwise live his life normally without significant limitation. (*See id.* at 87, 89, 201).

If a jury placed greater weight on the testimony and evidence casting doubt on the severity of Gargas's SVT and its connection to Gargas's claimed work restriction, it could reasonably conclude Gargas's SVT is not serious enough to preclude him from all jobs requiring nighttime work and, therefore, could reasonably conclude that Gargas's SVT did not substantially limit his ability to work. *See Booth v. Nissan N. Am., Inc.*, 927 F.3d 387, 394 (6th Cir. 2019) (plaintiff's showing his neck injury rendered him unable to perform a single job was not sufficient to show that the injury substantially limited his ability to work). Because the mixed evidence in this case would permit a reasonable jury to draw conclusions in either direction, I deny Gargas and Estes Express summary judgment on the threshold question of whether Gargas is disabled.

### b. Knowledge of Disability

"An employee cannot be subject to an adverse employment action based on his disability unless the individual decisionmaker responsible for [that action] has knowledge of that disability" or

had reason to know of that disability. *Tennial*, 840 F.3d at 306; *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 737-38 (6th Cir. 2015). Gargas argues Estes Express generally was aware he had SVT and took Toprol, and he further argues a number of decisionmakers in his case knew of his work restriction. (Doc. No. 49 at 33). Estes Express asserts Hughes is the sole decisionmaker in this case and argues she did not know Gargas's work restriction was linked to any alleged disability and did not know Gargas had SVT or took Toprol. (Doc. No. 55 at 29). Further, Estes Express argues that because Gargas submitted a Department of Transportation Medical Examination Report Form where the evaluating doctor stated Gargas had "no medical limitation," neither Hughes nor Estes Express knew Gargas had any physical or mental impairment at all. (*See id.*).

There is a genuine dispute of fact on this question. To begin, Estes Express's characterization of Hughes as "the decisionmaker" in this case is conclusory and does not accurately reflect the record evidence. Benschoter, Lamb, Torman, and Hughes were all involved in the conversations related to the decision to bar Gargas from working as a combo driver in June of 2019. (*See* Doc. No. 46-2; Doc. No. 50-3 at 44). Estes Express does not contest that this decision was an adverse employment action. (*See* Doc. No. 55 at 29; Doc. No. 49 at 34).

Gargas testified he personally informed at least three of these individuals—Benschoter, Lamb, and Torman—that his SVT, a heart condition, prevented him from driving at night. (*See* Doc. No. 48-1 at 33-34, 61, 106-114). This is evidence all three "knew specifically" that Gargas had a physical impairment that restricted his ability to perform a certain kind of work. *Equal Emp. Opportunity Comm'n v. West Mead Place, LLP*, 841 F. App'x 962, 968 (6th Cir. 2021). If a jury accepts this testimony, it could conclude that any or all of these potential decisionmakers knew he was disabled. Moreover, the record contains conflicting evidence of who actually made and executed the decision to take Gargas out of service. (*See* Doc. No. 46-2; Doc. No. 50-3 at 44; Doc. No. 47-1 at 31-32; Doc. No. 46-1 at 71). So there is also a genuine dispute about who, exactly, was the

decisionmaker (or were the decisionmakers) with respect to this action.  A reasonable jury could conclude any or all of Benschoter, Lamb, and Torman decided to take Gargas out of service, and it could conclude any or all of them regarded Gargas as disabled.

On the other hand, Benschoter and Lamb denied these conversations ever took place in their deposition testimony.  (*See* Doc. No. 47-1 at 15-16; Doc. No. 46-1 at 21-22).  Torman will not be available to testify at trial, potentially limiting the parties' ability to rely on evidence of his knowledge.  (*See* Doc. No. 49 at 17 n.10); Fed. R. Evid. 801, 802.[7]  And Gargas does not point to evidence Hughes or Beacham, the other two Estes Express personnel involved in the decision to take him out of service, knew of his SVT.  (*See* Doc. No. 49 at 33-34; Doc. No. 57 at 12-14).  Thus, the record also contains enough evidence to allow a reasonable jury to conclude no decisionmaker with respect to Gargas's removal from service knew about his SVT.  There is a genuine dispute over whether Gargas was regarded as disabled with respect to his removal from service.

As to Hughes, and Gargas's ultimate termination, Gargas points to no evidence Hughes was ever told Gargas had SVT or a heart condition.  (*See* Doc. No. 55 at 29).  Hughes denies having any personal knowledge of Gargas's SVT.  (Doc. No. 43-1 at 100-101, 136, 138).  But Hughes unquestionably knew about Gargas's work restrictions: she saw Dr. Nielsen's notes—and knew they came from Gargas's physician.  Moreover, in the email exchange with Benschoter, Torman, Beacham, and Lamb, Hughes stated Gargas was "out until we have the sleep study results or until something becomes available on the dock during the day that allows us to accommodate his restrictions."  (Doc. No. 46-2 at 8).  A reasonable jury could conclude from this evidence that because Hughes was aware of Gargas's "physician-imposed work restrictions," she knew, or should have known, that Gargas was disabled.  *Cady v. Remington Arms Co.*, 665 F. App'x 413, 417 (6th Cir.

---

[7]  Because Torman is seriously ill, the parties agreed not to depose Torman or call him as a witness at trial.  (Doc. No. 49 at 17 n.10).

2016); *see Yarberry*, 625 F. App'x at 738 (6th Cir. 2015) (holding that the decisionmaker who terminated the plaintiff was on notice of the plaintiff's mental illness because the plaintiff's fiancée believed he needed to be hospitalized and because the plaintiff had behaved erratically and was placed in a psychiatric hospital); *cf. Arthur v. American Showa, Inc.*, 625 F. App'x 725, 708 (6th Cir. 2015) (finding the decisionmaker lacked knowledge of the defendant's disability where he was "wholly unaware of the specifics of his restrictions or why these restrictions were imposed").

Finally, I reject Estes Express's argument that a single document submitted to Estes Express stating Gargas had "no medical limitation" dissipates any genuine dispute over whether Estes Express decisionmakers knew Gargas was disabled. Whether "the legal entity is on notice" of a disability does not determine whether specific decisionmakers knew of that disability. *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013). On this record, I find there is a genuine dispute of material fact over whether Hughes, Torman, Lamb, or Benschoter knew or should have known Gargas was disabled.

### ii. Regarded As Disabled

As I noted above, an employee may prove disability discrimination under Ohio law where they are "regarded as having a physical or mental impairment" even if they do not in fact have a "physical or mental impairment that substantially limits one or more major life activities." Ohio Rev. Code § 4112.01(A)(13); *see* 42 U.S.C. § 12102(3)(A). To prove a "regarded as" case, "an employee need only show that their employer believed they had a 'physical or mental impairment,' as that term is defined in federal regulations." *Babb*, 942 F.3d at 319. This requires the "individual decisionmaker responsible for" a particular adverse employment action to "ha[ve] knowledge of" that perceived disability. *Tennial*, 840 F.3d at 306.

"Physical impairment" is "defined broadly, to include 'any physiological disorder or condition ... affecting one or more body systems.'" *Id.* at 319 (quoting 29 C.F.R. § 1630.2(h)). A

regarded-as plaintiff need not "show that the impairment limited [his] life activity." *Equal Emp.*
*Opportunity Comm'n v. West Mead Place, LLP*, 841 F. App'x 962, 967 (6th Cir. 2021) (quoting *Milholland*
*v. Sumner Cnty. Bd. of Educ.*, 569 F.3d 562, 566 (6th Cir. 2009)) (internal quotation marks omitted).
Likewise, "'the defendant['s] view of the magnitude of the effect of the perceived impairment on
[his] life activities'" makes no difference in this analysis. *West Mead Place*, 841 F. App'x at 967
(quoting *Mercado v. Puerto Rico*, 814 F.3d 581, 588 (1st Cir. 2016)).

As an affirmative defense, "the employer may then rebut this showing by pointing to
objective evidence 'that the impairment is (in the case of an actual impairment) or would be (in the
case of a perceived impairment) both transitory and minor.'" *Babb*, 942 F.3d at 319 (quoting 29
C.F.R. § 1630.15(f)). Estes Express does not raise this affirmative defense in its briefing. (*See* Doc.
No. 50-1 at 26-27; Doc. No. 55 at 28-29). Instead, it implicitly concedes SVT is a "physiological
condition . . . that affects one or more body systems" because it is a heart condition that affects the
cardiovascular system. 29 C.F.R. § 1630(h). Instead, as above, the parties dispute whether any
relevant decisionmaker at Estes Express knew Gargas had this physical impairment. (*See* Doc. No.
49 at 33; Doc. No. 55 at 29).

As I explained above, because Gargas testified he told Benschoter, Lamb, and Torman that
he had SVT and thus could not drive at night, a reasonable jury could conclude that any or all of
these potential decisionmakers "believed [Gargas] had a physical or mental impairment" and,
therefore, regarded him as disabled. *Babb*, 942 F.3d at 319. But because all three deny Gargas telling
them this, a reasonable jury could also conclude none of them regarded him as disabled. Similarly,
because Hughes knew Dr. Nielsen asserted a medical basis for Gargas's work restrictions—to the
extent that she agreed to allow medical testing to explore the scope of that condition—a reasonable
jury could conclude Hughes regarded Gargas as disabled.

Because there is a genuine dispute over whether the personnel involved in removing Gargas from service and terminating him regarded him as disabled, I decline to grant summary judgment to either party on this issue.

### iii.  Otherwise Qualified

To show he is otherwise qualified, Gargas must demonstrate he "can perform the essential functions" of his job.  *Hostettler*, 895 F.3d at 854.  "A job function is essential if its removal would fundamentally alter the position."  *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018) (quoting *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001)) (internal quotation marks omitted).  So, essential functions "are the core job duties, not the marginal ones." *Hostettler*, 895 F.3d at 854 (citing 29 C.F.R. § 1630.2(n)(1)).[8]

In conducting this "fact-intensive analysis," courts evaluate several factors, including, as relevant here: (1) the amount of time spent on a particular function; (2) the employer's judgment; (3) written job descriptions for the position, (4) the consequences of not requiring the employee to perform the particular function, (5) the work experience of past incumbents in the job, and (6) the current work experience of incumbents in similar jobs.  *Hostettler*, 895 F.3d at 854-55; 29 C.F.R. § 1630.2(n)(3) (listing factors).  While the employer's judgment is due "some weight in this analysis . . . it is not the end-all, *especially* when an employee puts forth competing evidence."  *Id.* at 855 (emphasis in original).

Ultimately, the "essential function" determination "'should reflect the actual functioning and circumstances of the particular enterprise involved.'"  *Hoskins v. Oakland Cnty. Sheriff's Dept.*, 227 F.3d 719, 726 (6th Cir. 2000) (quoting *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir.

---

[8]  If Gargas proceeds only under a "regarded-as" theory of discrimination, "the question of his qualification must be decided without regard to any potential accommodation."  *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 11 n.13 (6th Cir. 2012).

1988)). And whether a job function is "essential" is "typically not suitable for resolution" at summary judgment. *Keith v. Cnty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013).

Here, Gargas concedes—in fact, he insists—he was not able to work "overnight in any job description" because of his SVT. (Doc. No. 49 at 33). But as Estes Express points out, Gargas and Dr. Nielsen articulated several different formulations of Gargas's work restriction. Gargas testified he asked to be kept on "daytime driving" or the "day shift" and that he not be required to "work[] at night," work "during the night" or work "night-shift runs." (Doc. No. 48-1 at 37-38, 112). Dr. Nielsen's notes are not consistent either: the first note asks for Gargas to be kept on "daytime driving" and indicates he falls asleep by 9:00pm, the second expands this to "daytime driving of trucks or equipment," the third states Gargas cannot work the "night shift," and the fourth states Gargas can work from 5:00 or 6:00am at the earliest to 10:00pm at the latest. (*See* Doc. No. 42-3; Doc. No. 42-4; Doc. No. 42-6; Doc. No. 42-10). Dr. Nielsen's final note also indicates that "daytime" means "daylight hours." (Doc. No. 42-10). In his faxed letter requesting reinstatement, Gargas states he can work from 5:00 or 6:00am to 10:00pm. (*See* Doc. No. 43-18).

At the outset, therefore, I note there is a genuine dispute over the precise extent of Gargas's stated work restriction. Did it merely preclude him from working overnight but permit him to sometimes work during nighttime hours? Or, could he work only during the "daylight hours," however that term is defined? Or is it something in between? This matters because the scope of Gargas's work restriction also defines the scope of the essential function inquiry in this case.

Gargas argues his work restriction did not impinge on an essential function of his position because he performed city-based, non-nighttime P&D driving for over 99% of his working hours, making nighttime or overnight driving only a marginal function of his role. (Doc. No. 49 at 34; Doc. No. 57 at 20). In addition, he argues that Estes Express's payroll and time stamp reports show combo drivers and P&D drivers seldom drove after 9:00 pm and rarely performed nighttime

linehaul runs.  (Doc. No. 57 at 27-32).  Further, he argues the consequences of his work restriction would be "nonexistent" because other Estes Express employees "could have easily covered nighttime/overnight driving."  (*Id.* at 32-33).

Estes Express argues driving after 9:00 or 10:00pm is an essential function of both P&D and combo driving because its "judgment" and the "written [job] description" deem it essential for both positions.  (Doc. No. 50-1 at 30).  It also argues all combo drivers at the Toledo terminal except Gargas worked nighttime linehaul runs, and that when Gargas drove P&D runs, he occasionally drove as late as 11:00pm.  (Doc. No. 55 at 30-31).  The core of Estes Express's argument is that "such job functions that are contained in an employee's job description and necessary to the employer's business are 'essential' to the employee's position even if the functions are only performed occasionally."  (Doc. No. 50-1 at 30).

Viewing the evidence in the light most favorable to Gargas—that he could work as late as 10:00pm and his work restriction only encompassed overnight driving such as linehaul work—a reasonable jury could conclude overnight driving is not an essential function of either the P&D or combo driver positions.

It is true that the job descriptions for both combo and P&D drivers list working "different schedules" and "run[ning] over-the-road [linehaul] on occasion . . . based on business needs" as "essential functions."  (Doc. No. 50-3 at 35, 37).  This must be given "some weight."  *Hostettler*, 895 F.3d at 855.  But the record contains more than 1,000 pages of evidence documenting the actual, day-to-day work experience of P&D and combo drivers at the Toledo terminal.  The parties dispute what this evidence shows.  (*See* Doc. No. 57 at 27-32; Doc. No. 55 at 30).

By Gargas's calculations, between June 22, 2019 and December 31, 2019, the ten other combo drivers in Toledo drove nighttime linehaul runs less than 7% of the time, and no combo driver drove after 9:00pm in an hourly capacity on more than four occasions.  (Doc. No. 57 at 27-

28).  Gargas asserts that P&D drivers drove linehaul runs less than 4% of the time and never drove after 9:00pm more than twice.  (*See id.* at 28-32).

Further, Gargas testified that he did not drive any nighttime linehaul runs for the eighteen months from his accident until Estes Express began its rotation in June of 2019.  (*See* Doc. No. 48-1 at 94-99).  Estes Express offers no evidence of the potential consequences of a single combo driver not working overnight, and taking Gargas's testimony as true, he was able to avoid overnight work for nearly a year and a half with few issues.  Viewed in the light most favorable to Gargas, this evidence indicates that the amount of time combo and P&D drivers in the Toledo terminal spent working overnight may have been negligible, and the consequences of a single combo driver not working overnight were minimal.

Looking at the evidence this way, this case mirrors *Rorrer v. City of Stow*, 743 F.3d 1025 (6th Cir. 2014), in several key respects.  In *Rorrer*, the Sixth Circuit found that conditional language in the job description for a firefighter, combined with testimony that some firefighters never engaged in a purportedly-required activity "as a matter of choice," created a genuine dispute of fact on the "essential function" question. 743 F.3d at 1042-43.

Here, the job descriptions for the P&D and combo driver positions both use the conditional "may," there is evidence at least one employee—Gargas—opted out of overnight linehaul runs for a lengthy period, and there is evidence of at least a 6-month period where overnight linehaul work may have made up a mere fraction of the overall work for P&D and combo drivers.  As the Sixth Circuit explained, "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description."  *Id.* at 1043 (quoting *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003)).  So, Estes Express has failed to show the absence of a genuine dispute over whether overnight driving is an essential function of the combo or P&D jobs.

Viewing the evidence in the light most favorable to Estes Express—which involves assuming Gargas could only work during the daytime—I also reject Gargas's bid for summary judgment on this issue.  Gargas himself testified that P&D driving, which he says comprised the bulk of his work as a combo driver, could require a driver to run as late as 11:00pm.  (*See* Doc. No. 48-1 at 124).  Ethan Lauffer, a colleague of Gargas's at the Toledo terminal who worked as a combo driver, testified that although he rarely *drove* later than 9:00pm when he did P&D work, he regularly did other, non-driving work after finishing his shift.  (Doc. No. 44-1 at 17-20).  And Hughes testified that Estes Express "cannot guarantee that a driver is not going to drive into the night or at night . . . if there is a breakdown, if there's bad weather, if there is an accident."  (Doc. No. 43-1 at 142).

As I noted above, the six months of wage information for the Toledo terminal does show both combo and P&D drivers driving linehaul runs and driving after 9:00pm at least some of the time.  A reasonable jury could therefore conclude driving at night at least some of the time is an essential function of the combo and P&D positions.  *See Hunt v. Thorp*, No. 23-3459, 2024 WL 1159323 at *7 (6th Cir. March 18, 2024) (holding that as-needed dispatching duties in a county sheriff's office were an "essential function" of the position where the employee had to perform those duties "when the need arose" during emergencies).

In all, it would be "premature[]" to determine whether Gargas's work restriction encompassed an "essential function" of his position because of conflicting evidence about the nature of that restriction and because of conflicting evidence about the actual functioning and circumstances of the Toledo terminal.  *Rorrer*, 743 F.3d at 1043.  I deny both parties' summary judgment motions with respect to this issue.

#### iv.      Legitimate, Non-Discriminatory Reason

Estes Express argues it took Gargas out of service, and fired him, because "Plaintiff was not available to perform the essential functions of his job or any available job." (Doc. No. 50-1 at 31). Gargas does not contest that this rationale, as articulated by Estes Express, is a legitimate, non-discriminatory reason for taking these adverse actions against him. (*See* Doc. No. 57 at 17-28). An employee's inability or failure to perform an essential function of a job is a legitimate, non-discriminatory reason for taking an adverse action against them. *See Thompson v. Henderson*, 226 F. App'x 466, 477 (6th Cir. 2007) ("Defendant has submitted a legitimate, non-discriminatory reason for [plaintiff's] termination . . . [she] simply could not perform the essential functions of her job.").

#### v.      Pretext

At the pretext stage, a court must "ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). Typically, a plaintiff can do this "in three interrelated ways:" by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id.* at 400. But these categories of proof are neither exclusive nor rigidly applied. Instead, they are "a convenient way of marshaling evidence and focusing it on the ultimate inquiry:" whether the employer "made up its stated reason to conceal intentional discrimination." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Chen*, 580 F.3d at 400 n.4).

Gargas argues Estes Express's proffered reason is pretextual because it

(1) had no basis in fact, i.e. there was no "rotation:" (2) the proffered reasons did not actually motivate the employer's action as Estes' plan was to always add more P&D City Drivers excluding Mr. Gargas; or (3) that they were insufficient to motivate the employer's action as "nonavailability" of work ignored the re-classification of four combo driver positions, the hiring of 25 new employees, and is code for its 100% healed policy.

(Doc. No. 49 at 24).

41

Estes Express argues the rotation was real and well-documented, that Gargas has offered no evidence of any "plan" to add P&D drivers while excluding Gargas, and that it took its adverse actions against Gargas because of *Gargas*'s unavailability—that is, because his work restriction rendered him legitimately ineligible for any open Estes Express jobs.  (*See* Doc. No. 55 at 20-22, 28-30).

Here, too, the factual disputes about the nature of Gargas's work restriction affect the resolution of the pretext question.  This is because the evidence at the core of the dispute over pretext—Estes Express's filling of open positions while Gargas was out of service—looks different depending on how broad or narrow the work restriction is.[9]  Viewed in Gargas's favor, his work restriction prevented him from working overnight but otherwise left him free to work from early in the morning into the night.  Viewed in Estes Express's favor, Gargas's work restriction limited him to working only during daylight hours.

With this in mind, there is a genuine dispute of fact as to pretext.  As I explained above, if Gargas's stated work restriction only prevented him from working overnight, a reasonable jury could conclude Gargas was able to perform the essential functions of his position as a combo driver and the essential functions of the P&D job.  Gargas testified he put his name on the "wish list" for open P&D positions before he was taken out of service.  (*See* Doc. No. 48-1 at 119).  And Benschoter

---

[9]  I reject Gargas's first pretext argument.  Gargas cites no evidence for the proposition that there was "no 'rotation,'" and the record plainly contradicts him on this point.  Lamb and Benschoter consistently testified they decided to rotate combo drivers to cover an increase in nighttime linehaul runs for a period of several months beginning in June of 2019.  (Doc. No. 47-1 at 19; Doc. No. 46-1 at 29-30).  Wage records for Estes Express show that combo drivers at the Toledo terminal drove nighttime linehaul runs at least some of the time from June of 2019 to December of 2019.  (*See* Doc. No. 50-3 at 10; Doc. No. 57 at 20-28).  Moreover, Gargas himself acknowledged being told of the rotation and described it in some detail—this is what precipitated his request to "stay on daytime driving" to begin with.  (Doc. No. 48-1 at 101-103, 154).  At most, Gargas and Estes Express dispute the length of the rotation and the total amount of time combo drivers spent doing linehaul runs during this period.  But there is no genuine dispute that Estes Express did rotate its combo drivers during this period and that the combo drivers did perform nighttime linehaul work.

testified that Gargas would not have been eligible for the P&D positions if his name had been on the list, because he was "out of service due to his restrictions."  (Doc. No. 46-1 at 95).  Further, Gargas testified that Torman, who participated in the decision to take Gargas out of service, was "arrogant," "mean," and "didn't want to hear anything about this disability" when Gargas tried to explain his work restriction to him on the phone.  (*Id.* at 35).

Viewed in the light most favorable to Gargas, there is evidence Gargas could perform the essential functions of the combo driver and P&D jobs, and there is evidence relevant decisionmakers treated Gargas's work restriction as a health-related nuisance.  Taken together, it would allow a "jury [to] reasonably doubt" that Estes Express removed Gargas from service because he could not perform the essential functions of any open position and would allow that jury to conclude "the real reason" Estes Express did so is because it regarded Gargas as disabled due to his SVT.  *Chen*, 580 F.3d at 400 n.4 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Viewing the evidence in the light most favorable to Estes Express yields a different outcome.  First, this requires assuming Gargas's work restriction allowed him to work only during the daytime—and, per Dr. Nielsen's first two notes, required him to leave work early enough to be asleep "by 9 o'clock."  (Doc. No. 43-14).  As I explained above, a reasonable jury could conclude that working after 9:00pm is an essential function of the combo and P&D jobs.  An employer may terminate an employee for being unable to perform an essential function of their job.  *Thompson*, 226 F. App'x at 477.

In addition, a reasonable jury taking note of Estes Express's initial offer to Gargas of a dockworker position and subsequent discussion of a daytime jockey position could conclude Estes Express was not intent on firing Gargas because of an actual or perceived disability.  (*See* Doc. No. 46-2; Doc. No. 43-1 at 189-92).  And, in context, a jury could conclude that Torman's email stating, "If he cannot drive at night, then he cannot drive" reflects Estes Express's position that nighttime

43

driving is an essential function of the combo driver position and does not reflect any discriminatory intent.  (Doc. No. 46-2).  Put differently, if Gargas's work restriction required him to leave work in time to be asleep by 9:00pm, a reasonable jury could find this, and not Gargas's perceived disability, was "the real reason" Estes Express removed Gargas from work.  *Chen*, 580 F.3d at 400 n.4 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Gargas makes one additional argument.  He asserts, repeatedly, that Estes Express had a "100% healed" policy, and he cites *Henderson v. Ardco*, 247 F.3d 645 (6th Cir. 2001), for the proposition that an employer violates the ADA if it requires an employee to be without any restrictions at all before considering returning him to work.  (*See* Doc. No. 49 at 31, 34). But Gargas misconstrues *Henderson* and misstates the record.

*Henderson* held that an employer's application of a "100% healed" policy was enough to show the plaintiff was regarded as disabled.  *See Henderson*, 247 F.3d at 652-53.  Back then, prior to the 2008 amendments to the ADA, an employee could not show their employer regarded them as disabled without proving the employer believed their impairment substantially limited a major life activity—in Henderson's case, the major life activity of working.  *See id.* at 650.  So, in *Henderson*, the employer's "100% healed" policy was evidence of the knowledge requirement: it showed the employer believed the plaintiff was unable to work in a broad class of jobs because of her injury.  *See id.* at 650.

But *Henderson* does not stand for the proposition that the application of a "100% healed policy" is a *per se* violation of Ohio disability discrimination law.  Instead, *Henderson* explained that doing so would "foreshorten[] the inquiry" required by the ADA.  *Id.* at 653.  Further, it is not clear from Gargas's brief how he envisions *Henderson* applying to arguments about pretext.  Again, *Henderson* did not address that part of the burden-shifting inquiry.  It instead focused on the

threshold question of whether the plaintiff was regarded as disabled for purposes of the *prima facie* case.  *See id.* at 652-53.  So *Henderson* does not control here.

Relatedly, Gargas asserts Estes Express perceived him "as 'unable to work in any relevant position'" because of his stated work restriction.  (Doc. No. 49 at 31 (quoting *Moorer v. Baptist Memorial Health Care Sys.*, 398 F.3d 469, 483–84 (6th Cir. 2005)).  But he has not pointed to evidence supporting this assertion.

The relevant possible decisionmakers—Torman, Benschoter, Beacham, Hughes, and Lamb—appeared to perceive Gargas as unable to fulfill all his responsibilities as a combo driver because of his inability to drive at night.  (*See* Doc. No. 42-6; Doc. No. 46-1 at 29, 73; Doc. No. 47-1 at 18).  But in the very same email chain where Torman states Gargas "cannot drive" if he cannot drive at night, other Estes Express personnel propose offering Gargas a position working the dock, until Gargas clarifies his work restriction means he cannot work in that position either.  (*See* Doc. No. 42-6).  And Gargas's testimony confirms he was offered this dock-work position.  (Doc. No. 48-1 at 59-60).

Moreover, even though Gargas disputes whether he was truly "offered" the daytime jockey position, there is no dispute he was at least invited to apply for it.  (*See* Doc. No. 48-1 at 56-57; Doc. No. 43-1 at 244-45).  Other email evidence shows Hughes asking if "we have anything open on the dock/jockey/office" for Gargas.  (Doc. No. 50-3 at 44).  At most, therefore, Gargas has demonstrated Estes Express viewed his work restriction as precluding him from all driving-based positions which, in Estes Express's view, require the ability to drive at night.  There is no evidence Estes Express "flatly bar[red]" Gargas "from working any job at [the] company" so as to constitute a "100% healed" rule.  *Watts v. United Parcel Serv.*, 378 F. App'x 520, 526 (6th Cir. 2010).  I reject Gargas's "100% healed" argument on this ground as well.

Because there are genuine disputes of material fact regarding whether Gargas was disabled or, alternatively, whether Estes Express regarded Gargas as disabled; whether Gargas was otherwise qualified for his position; and whether Estes Express's asserted legitimate, non-discriminatory reason was pretextual, I decline to grant summary judgment to either party on Gargas's discriminatory treatment claim (Count 3).

### b.    Failure to Accommodate

Ohio law also prohibits an employer's failure to "make reasonable accommodation to the disability of an employee or applicant, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business." *King v. Steward Trumbull Memorial Hosp.*, 30 F.4th 551, 560 (6th Cir. 2022) (quoting Ohio Admin. Code 4112-5-08(E)(1)).

A plaintiff bringing a failure-to-accommodate claim "bears the initial burden of making out a prima facie case." *King*, 30 F.4th at 560 (citing *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) (additional parenthetical cite omitted)). "To establish a prima facie claim for failure to accommodate, a plaintiff must show that (1) [he] was disabled within the meaning of [the statute], (2) [he] was otherwise qualified for her position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about [his] disability; (4) [he] requested an accommodation; and (5) the defendant failed to provide the necessary accommodation." *King*, 30 F.4th at 560 (internal citations and quotation marks omitted); *accord Childs v. Kroger Co.*, 222 N.E.3d 741, 776 (Ohio Ct. App. 2022). "If the plaintiff makes this showing, then the burden shifts to the employer to show that the accommodation would cause undue hardship for the employer." *King*, 30 F.4th at 560 (internal citations omitted).

Estes Express argues Gargas cannot show he was disabled; Gargas was not otherwise qualified for his position because he could not drive at night; Estes Express did not and could not

have known about Gargas's disability; and Gargas's requested accommodation was not reasonable because it would eliminate an essential function of his combo driver position and would otherwise cause an undue hardship to Estes Express. (*See* Doc. No. 50-1 at 32; Doc. No. 55 at 32-33). It also argues that any breakdown in the interactive process is attributable to Gargas, not Estes Express, because he refused offers to transfer to open dockworker and jockey positions. (*See id.*).

Gargas argues he was disabled; he was otherwise qualified for his position as a combo driver notwithstanding his nighttime driving restriction; numerous Estes Express decisionmakers knew about his condition and its effect on his ability to drive at night; his accommodation was reasonable—and any burden on Estes Express caused by the accommodation was not undue—because nighttime driving was a minimal part of his job; and Estes Express was responsible for the breakdown in the interactive process because it did not offer him the jockey position at all. (*See* Doc. No. 49 at 36-37; Doc. No. 53 at 29).

### i. Disability

Under Ohio law, a plaintiff must show he has a disability in order to make out a failure-to-accommodate claim. *Childs*, 222 N.E. 3d at 776 n.10. For the reasons discussed in my analysis of Gargas's discriminatory treatment claim, there is a genuine dispute over whether Gargas is disabled.

### ii. Otherwise Qualified

An employee is qualified for their job under Ohio law if they "can safely and substantially perform the essential functions of the job in question, with or without reasonable accommodation." *King*, 30 F.4th at 560 (quoting Ohio Admin. Code 4112-5-02(K)). Analyzing this prong requires answering two subsidiary questions: 1) whether Gargas "could perform the 'essential' functions" of his combo driver job with or without an accommodation, and 2) if he did need an accommodation to perform the essential functions of his job, whether that "required accommodation [is] reasonable." *King*, 30 F.4th at 560. Here, as for the "otherwise qualified" prong of Gargas's

discriminatory treatment claim, the parties dispute whether nighttime driving is an essential function of the combo driver position.  Estes Express argues it is an essential function, and that because eliminating an essential function of a job is not a reasonable accommodation, Gargas is not otherwise qualified for his role. (*See* Doc. No. 55 at 30-31).  Gargas argues nighttime driving is not an essential function of his combo driver position, and that he can otherwise perform all essential functions of that job.  (*See* Doc. No. 57 at 20-27).

I concluded earlier that there is a genuine dispute of fact over whether the kind of nighttime driving encompassed by Gargas's stated work restriction is an essential function of his job as a combo driver.  For those reasons, I likewise conclude there is a genuine dispute of fact over whether Gargas was otherwise qualified for purposes of his failure-to-accommodate claim.  I deny both parties summary judgment on this issue.

### iii.    Knowledge of Gargas's Disability

"[A]n employee does not have to use 'magic words' or explicitly use the word 'disability' to put [his] employer on notice of [his] condition."  *King v. Steward Trumbull Mem. Hosp., Inc.*, 30 F.4th 551, 563-64 (6th Cir. 2022) (quoting *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007)).  Rather, an employer knows or should know of its employee's disability when it "'know[s] enough information about the employee's condition to conclude that he is disabled.'"  *King*, 30 F.4th at 563-64 (quoting *Cady v. Remington Arms Co.*, 665 F. App'x 413, 418 (6th Cir. 2016)).  Such information can include, "among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions."  *Id.*

Of particular importance here, the plaintiff must show that the relevant decisionmaker with respect to their requested accommodation—rather than the employer as a general entity—knew they were disabled and were asking for an accommodation.  *See Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 307 (6th Cir. 2016) (rejecting the plaintiff's failure-to-accommodate claim because the plaintiff's

"fleeting reference" to the ADA did not put his supervisor, who did not know about the plaintiff's disability, "on notice of an accommodation request"). Gargas asserts that Benschoter, Lamb, and Hughes denied his request for an accommodation by declining to let him avoid nighttime or overnight driving. [10]  (*See* Doc. No. 49 at 36-37).  For the same reasons I have already discussed, the evidence as to each of these potential decisionmakers satisfies the "minimum" criterion that it be "clear from the context that [the request] is being made in order to conform with existing medical restrictions.'" *Tennial*, 840 F.3d at 307 (quoting *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x. 652, 658 (6th Cir. 2016) (internal citation and quotation marks omitted).  At the same time, "a jury might find . . . persuasive" Estes Express's evidentiary arguments about these decisionmakers' lack of knowledge.  *Cady*, 665 F. App'x at 418.  Therefore, there is a genuine dispute as to whether those decisionmakers knew of Gargas's disability.  I decline to grant summary judgment to either party on this issue.

### iv.    Request for an Accommodation and Interactive Process

An employee "bears the 'initial burden of requesting an accommodation.'"  *King*, 30 F.4th at 564 (quoting *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998)).  That initial requested accommodation must be "objectively reasonable."  *Cooper v. Dolgencorp*, 93 F.4th 360, 371 (6th Cir. 2023) (internal citations and quotation marks omitted).  But employees have "some flexibility" in how they make this request: they need not use the word "accommodation," and medical documentation—while helpful—is not required.  *King*, 30 F.4th at 564 (quoting *Mobley v. Miami Valley Hosp.*, 603 F. App'x 405, 413 (6th Cir. 2015)) (additional citations omitted).  Further, a

---

[10]  In his recitation of facts in his motion for summary judgment, Gargas suggests that several other Estes Express employees knew of his SVT and his modified driving schedule.  (*See* Doc. No. 49 at 16-17).  But Gargas only argues that Benschoter, Lamb, Torman, and Hughes denied him an accommodation.  (*See id.* at 34-37; Doc. No. 57 at 15).  So my analysis of the knowledge issue for purposes of Gargas's failure to accommodation claim focuses on those "decisionmaker[s]" Gargas has identified.  *Tennial*, 840 F.3d at 306.

plaintiff's requests may be written or oral, and "an employee's initial request does not need to identify the perfect accommodation from the start." *King*, 30 F.4th at 564 (quoting *Ford Motor Co.*, 782 F.3d at 779 (Moore, J., dissenting)).

An employee's request for a reasonable accommodation triggers an informal interactive process between the employee and employer to determine "how best to accommodate his disability." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 421 (6th Cir. 2020). This iterative process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007). Both parties must participate in this process in good faith. *See id.* For an employer, this includes "conduct[ing] an 'individualized inquiry' into possible accommodations." *King*, 30 F.4th at 565 (quoting *Rorrer*, 743 F.3d at 1045). An employee cannot "recover under" an interactive-process theory of liability unless he "show[s] that he proposed a reasonable accommodation and would have been reasonably accommodated but for [the employer's] refusal to participate in good faith." *Mobley*, 603 F. App'x at 414.

Estes Express does not contest that a reasonable jury could find that Gargas's purported verbal requests to "stay on daytime driving," and Dr. Nielsen's notes asking Estes Express to not schedule Gargas for some form of nighttime driving, are accommodations requests. (*See* Doc. No. 49 at 31-34 Doc. No. 55 at 31-34). And as I explained above, there is a genuine dispute over whether Gargas's requested accommodation of not driving at night was reasonable because there is mixed evidence as to whether driving at night is an essential function of Gargas's combo driver position.

But that does not end the inquiry here, because the parties dispute who is responsible for any breakdown in the interactive process. In Gargas's view, "within 24 hours of Mr. Gargas' request for accommodation, all of the decision-makers – Benschoter, Lamb, and Hughes – declared 'we

50

cannot accommodate' without even speaking to Mr. Gargas." (Doc. No. 49 at 37).  Estes Express, on the other hand, asserts it offered Gargas at least two reasonable accommodations, discharging its obligation to participate in the interactive process in good faith: first, the nighttime dockworker position, and second, a daytime jockey position.  (Doc. No. 50-1 at 32-33).

These arguments implicate the law regarding alternative accommodations, including job transfers. An employer "is not required to propose a counter accommodation in order to participate in the interactive process in good faith." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010).  But they may do so—and that alternate accommodation may include a reassignment to a vacant position for which the employee is otherwise qualified.  *See Cooper*, 94 F.4th at 372 (noting that "[a] 'reasonable accommodation' under the ADA can include 'reassignment to a vacant position'") (quoting 42 U.S.C. § 12111(9)(B)).  Offering a reasonable counter accommodation can be evidence of good faith.  *See Mobley*, 603 F. App'x at 414.  Moreover, if an employer "offers a reasonable counter accommodation, the employee cannot demand a different accommodation." *Jakubowski*, 627 F.3d at 203.

This record is too murky to warrant granting summary judgment for either party on the interactive process issue.

On the one hand, Gargas's characterization of events leaves out some important uncontested details.  First, there is no dispute that Gargas was offered a nighttime dockworker position when Dr. Nielsen's first note indicated Gargas should not be taken off of "daytime driving" and that Gargas should undergo "a sleep deprivation sleep study to prove his safety." (Doc. No. 42-3).  Nielsen's second note clarified that Gargas's work restriction extended to all overnight work, not just driving. (*See* Doc. No. 42-4).  Then, Gargas underwent the sleep study Dr. Nielsen requested, which produced results that Dr. Nielsen vigorously contested. (*See* Doc. No. 42-6).  Only at this point did Gargas speak with McMahon, where they discussed the jockey position. (*See* Doc. No. 48-

1 at 54-55). While Gargas insists his work restriction and requested accommodation was clear from the outset, a jury could find that the back and forth with Dr. Nielsen instead reflected Hughes—and Estes Express's—attempts to "identify the precise limitations resulting from" Gargas's disability and accommodate it appropriately. *Kleiber*, 485 F.3d at 871.

Moreover, the parties tell diametrically opposed stories about what happened next. Estes Express insists Gargas was actually offered the jockey position and was told that all he needed to do to claim the role was submit his materials through Brass Ring. (*See* Doc. No. 50-1 at 33-34). Hughes testified as much in her 30(b)(6) deposition. (*See* Doc. No. 43-1 at 192-93). And Gargas does not argue the daytime jockey position would not have been a reasonable alternative accommodation. (*See* Doc. No. 57 at 17-18). But Gargas testified he was guaranteed nothing and was simply told to apply for the jockey position if he was interested. (*See* Doc. No. 48-1 at 54-55). That is, he says he was not offered a transfer to another position at all. Further, Gargas insists he put his name on the Toledo terminal "wish list" for P&D jobs—indicating his affirmative interest in the position—but he was passed over when Estes Express hired new P&D drivers (though Benschoter testified Gargas's name was not on the wish list). (*See* Doc. No. 48-1 at 119; Doc. No. 46-1 at 49).

This factual dispute is crucial because this is the moment the informal interactive process required by the ADA irretrievably broke down. If a jury believes the version Hughes's testimony and other evidence most favorable to Estes Express, Estes Express corresponded with Gargas's physician to figure out the scope of his work restriction, then offered Gargas a transfer to the reasonably comparable jockey position, which Gargas denied. This would make him the cause of the breakdown. *See Hankins v. The Gap, Inc.*, 84 F.3d 797, 800-01 (6th Cir. 1996) (plaintiff was the cause of the breakdown in the interactive process because she refused the reasonable alternate

accommodation of leave time after her employer denied her initial requested accommodation of a transfer to a different position).

On the other hand, if a jury believes the version of Gargas's testimony and other evidence most favorable to Gargas, Estes Express made no attempt to accommodate him at all after Dr. Nielsen clarified the contours of Gargas's work restrictions, and it deliberately ignored his interest in the P&D driver position, even when there were openings available. A jury could reasonably conclude Estes Express's "failure to respond" once it clarified the extent of Gargas's work restrictions violated its "continuing mandatory duty of good-faith participation in the interactive process." *Fisher*, 951 F.3d at 422. Therefore, because the resolution of this legal issue turns on factual disputes that only a jury may resolve, I decline to grant summary judgment to either party on Gargas's failure to accommodate claim.

Gargas makes one additional argument. Relying on *Keith v. County of Oakland*, 703 F.3d 918, (6th Cir. 2013), he suggests that Estes Express failed to conduct an "individualized inquiry" because Estes Express did not speak with him personally to ask about the contours of his disability and how it might affect his ability to do his job. (*See* Doc. No. 49 at 36-37). But the portion of *Keith* he cites does not control the resolution of his failure to accommodate claim.

First, *Keith* involved a meaningfully different factual context: a deaf individual who had applied for a job as a lifeguard. *See* 703 F.3d at 919-920. There, the plaintiff did not currently work for the defendant, so the individualized inquiry could not depend on a base of knowledge the employer already possessed about the plaintiff's work history and abilities. Here, by contrast, Gargas had worked for Estes Express for years—his employer already knew him well. Second, while *Keith* noted the defendant's failure to speak with the plaintiff as one factor weighing in favor of its conclusion that the defendant had not participated in the interactive process in good faith, it did not establish a legal rule requiring such a conversation in every instance. Instead, it held only that

53

the interactive process must be tailored to the specific facts of an individual's case and may not rest on a "cursory medical examination" or similarly shallow investigation. *Id.* at 924.

Here, Dr. Nielsen's back-and-forth with Estes Express is evidence Estes Express engaged in the "individualized inquiry" and did not conduct the kind of "cursory medical examination" *Keith* prohibits. Dr. Nielsen sent four separate, iterative notes to Estes Express regarding Gargas's work restriction, and the sleep test that Gargas eventually underwent was Dr. Nielsen's idea. By contrast, in *Keith*, the doctor "entered the examination room[,] . . .briefly reviewed Keith's file, [and] declared, 'He's deaf; he can't be a lifeguard.'" 703 F.3d at 923-24. No such medical examination occurred in this case. Instead, because the evidence related to the interactive process in this case depends on credibility determinations and evidence-weighing that only a jury may conduct, I decline to grant summary judgment for either party.

For the reasons I explained, I find there is a genuine dispute of fact about each element of Gargas's failure to accommodate claim. Therefore, I deny both parties' motions for summary judgment on this claim (Count 4).

## 2. Ohio Law Retaliation Claim

Ohio law prohibits "discriminat[ion] in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under" Ohio antidiscrimination law. Ohio Rev. C. § 4112.02(I). To prove a claim of retaliation under Ohio law, a plaintiff must show "'(1) [he] engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Hall v. Crawford Cnty. Job & Family Servs.*, 188 N.E.3d 1138, 1148-49 (Ohio Ct. App. 2022) (internal citations and quotation marks omitted).

Gargas argues: "Mr. Gargas was retaliated against in violation of Ohio law when after requesting an accommodation[,] he was removed from driving, not permitted to return unless he was without a restriction, and then terminated for 'nonavailability' even though all of the evidence reflects there was ample work available." (Doc. No. 49 at 39). Estes Express argues Gargas's retaliation claim fails because he never engaged in any "protected activity" under Ohio law. (*See* Doc. No. 50-1 at 34-35). Gargas does not respond to Estes Express's arguments in his opposition brief. (*See* Doc. No. 57).

While the law of the ADA tracks Ohio disability discrimination law in many respects, the two are not perfectly congruent. Unlike under the ADA, a "request for a reasonable accommodation is not a protected activity under" Ohio antidiscrimination law. *Hall*, 188 N.E.3d at 1150; *accord Musil v. Gerkin Materials, Inc.*, No. L-19-1262, 2020 WL 3529662 at *4 (Ohio Ct. App. June 30, 2020) (emphasis added). *Cf. A.C. ex. rel. J.C. v. Shelby Cnty Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013) ("Both this circuit and most others agree that requests for accommodation are protected acts under . . . *the ADA*.") (emphasis added).

In his briefing, Gargas identifies only "requesting an accommodation" as potential protected activity under Ohio law, so Ohio courts' interpretation of Ohio Rev. C. § 4112.02(I) forecloses a retaliation claim as to that conduct. (Doc. No. 49 at 29). True, Gargas's complaint also identifies "opposing discriminatory treatment by Defendant against him, and filing a charge of discrimination with the OCRC" as protected activity. (Doc. No. 1 at 12). But Gargas points to no evidence, and he makes no argument, that he did either of those things. (*See* Doc. No. 49 at 39; Doc. No. 57 at 20-33). Because Gargas has failed to show he engaged in any protected activity cognizable under Ohio law, his retaliation claim fails.

I grant Estes Express's motion for summary judgment, and I deny Gargas's motion, as to Gargas's retaliation claim (Count 5).

3.    **FMLA Claims**

The FMLA entitles qualifying employees to take up to 12 weeks of unpaid leave for, among other reasons, a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(1)(D).  When an employee's leave expires, he "must be reinstated to [his] position or to a position equivalent in pay, benefits, and other terms and conditions of employment." *Bryson v. Regis Corp.*, 498 F.3d 561, 569-70 (6th Cir. 2007) (citing 29 U.S.C. § 2614(a)(1)).  There are two theories of recovery under the FMLA: "an interference (or entitlement) theory and a retaliation (or discrimination) theory." *Hunter v. Valley View Local Schs.*, 579 F.3d 688, 691 (6th Cir. 2009).  "A plaintiff proceeding under a retaliation theory must show discriminatory or retaliatory intent, whereas a plaintiff alleging interference need not prove any unlawful intent on the part of his employer." *Tennial*, 840 F.3d at 308.  Gargas, who says he was eligible for FMLA leave because his SVT is a "serious health condition," asserts both theories of recovery.  (*See* Doc. No. 49 at 25-29; Doc. No. 1 at 7-8.)

a.    **FMLA Interference**

To establish a claim of interference under the FMLA, a plaintiff must show (1) he is an eligible employee, (2) the defendant is an employer as defined under the FMLA, (3) the employee was entitled to FMLA benefits, (4) the employee gave the employer notice of his intention to take leave, and (5) the employer denied the employee FMLA benefits to which he was entitled.  *Tennial*, 840 F.3d at 308.

Gargas argues Estes Express interfered with his rights under the FMLA in two ways: by failing to reinstate him even though he could perform the essential functions of his job, and by forcing him to take FMLA leave in the first place.  (Doc. No. 49 at 25, 27).  Estes Express makes several arguments in response: Gargas did not have a "serious health condition" qualifying him for FMLA benefits, Gargas could not perform the essential functions of his job and was thus not

56

entitled to reinstatement, and Gargas cannot recover on his forced-leave theory because Estes Express never denied any of his requests for FMLA leave. (Doc. No. 50-1 at 19-22)  I agree Gargas was not entitled to FMLA benefits because he did not have a "serious health condition" qualifying him for FMLA benefits in the first place, and further, that he cannot recover on his forced-leave theory because Estes Express never denied any of Gargas's FMLA leave requests.

### i.    Serious Health Condition

Gargas asserts he was entitled to take FMLA leave because he suffers from a "serious health condition."  29 U.S.C. § 2612(a)(1)(D).  A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves . . .  (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  "Inpatient care" means "an overnight stay in a hospital, hospice, or residential medical care facility."  29 U.S.C. § 825.114.  "Continuing treatment" requires, at the very least, a "period of incapacity" related to the condition.  *See* 29 C.F.R. § 825.115; *see also Koch v. Thames Healthcare Grp., LLC*, No. 1:18-cv-00039, 2020 WL 1542340 at *5 (W.D. Ky. March 31, 2020) (quoting 29 C.F.R. § 825.115 and noting it "requires a 'period of incapacity'").  "Incapacity" means "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom."  29 C.F.R. § 825.113(b).  A plaintiff bears the burden of showing he had a "serious health condition" such that he qualified for FMLA leave. *See Morris v. Fam. Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 336-37 (6th Cir. 2009) (granting summary judgment because the plaintiff failed to make this showing).

Even assuming Gargas's SVT qualifies as an "impairment" for FMLA purposes, Gargas has not shown his SVT required any inpatient treatment, and he has "produced no evidence that he had a period of incapacity relating to" his SVT.  *Lackey v. Jackson Cnty.*, 104 F. App'x 483, 489 (6th Cir. 2004).  When Gargas visited the hospital after his truck accident on November 29, 2017, he was

discharged the same day he was admitted, five hours after he arrived.  (Doc. No. 42-1 at 6) (noting the arrival time as "12:28" and the discharge time as "17:36" on November 29, 2017).  Gargas has pointed to no evidence he spent any time in the hospital for his SVT after his initial diagnosis.  (*See* Doc. No. 49 at 24-27; Doc. No. 57 at 33-37).  So, he has failed to show his SVT required inpatient care.

Further, Gargas has not pointed to evidence his SVT ever rendered him unable to work or perform other regular daily activities.  Instead, as Gargas testified at his deposition, he was able to engage in fishing, boating, cardio, and weightlifting "as often as [he] wanted to" since his diagnosis, and his SVT did not limit his ability to take care of himself or otherwise engage in "normal life" activities. (Doc. No. 48-1 at 86-87, 89).  And while the record contains documentation of Gargas's follow-up appointments with Dr. Nahhas related to his SVT, there is no indication Gargas was ever unable to work or engage in his regular life activities because of SVT or because of treatment related to his SVT.  (*See* Doc. Nos. 42-2, 42-14, 42-15, 42-16).  Further, to the extent Gargas argues his nighttime-work restriction is evidence he was incapacitated, "[c]ourts in this Circuit have found that restrictions do not militate a finding of incapacity." *Taylor v. Autozoners, LLC*, 706 F. Supp. 2d 843, 853 (W.D. Tenn.) (citing cases).  Because Gargas has failed to show his SVT is a "serious health condition," he cannot establish he was entitled to FMLA benefits.  Therefore, his first FMLA interference theory fails.

### ii.      Forced-Leave Theory

Gargas also pursues what sometimes is called a "forced-leave" or "involuntary leave" theory.  (*See* Doc. No. 49 at 27).  But this theory also fails, though for a different reason.

An employee can prove an involuntary-leave claim, which "is really a type of interference claim," when an employer "forces an employee to take FMLA leave when the employee does not have a 'serious health condition' that precludes [him] from working." *Wysong v. Dow Chem. Co.*, 503

F.3d 441, 449 (6th Cir. 2007).  But "the employee's claim ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past."  *Id.* (citing *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)).  This is because the remediable injury in this type of FMLA interference claim is the denial of "FMLA leave to which [the plaintiff] was entitled *as a result*" of the employer "forcing [the plaintiff] to take earlier leave" when he did not need or ask for it.  *Id.* at 450 (emphasis added).

In *Wysong*, the court explained that in order to create a "ripe[] involuntary leave" claim, a plaintiff without a serious health condition must prove "[he] later requested FMLA leave, but that [the employer] refused, based on the fact that [he] had already used up [his] available FMLA leave."  *Id.* at 450.  Gargas has failed to make that showing here.  Even if I assume Estes Express forced Gargas to take FMLA leave, there is no evidence Estes Express ever denied a request from Gargas to use FMLA leave.  (*See* Doc. No. 49 at 24-27; Doc. No. 55 at 35-36).  Because Gargas's involuntary-leave claim was never ripe, it fails.

I grant Estes Express's motion for summary judgment, and I deny Gargas's motion, as to Gargas's FMLA interference claim (Count 1).

### b.    FMLA Retaliation

The FMLA "affords employees protection in the event they suffer retaliation or discrimination for exercising their rights under the FMLA."  *Arban v. West Publ'g Co.*, 345 F.3d 390, 403 (6th Cir. 2003).  To prove retaliation, Gargas "must show that taking leave was a causal factor" in an adverse employment action Estes Express took against him.  *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 377 (6th Cir. 2017) *see also* 29 C.F.R. § 825.220(c) (prohibiting employers from using "the taking of FMLA leave as a negative factor in employment actions").  He may offer either direct or indirect evidence to do so.  *Marshall*, 854 F.3d at 377.

Here, Gargas takes the indirect evidence route.  (*See* Doc. No. 49 at 28).  The Sixth Circuit applies the *McDonnell Douglas* burden-shifting test to FMLA retaliation claims based on indirect evidence.  *Edgar*, 443 F.3d at 508.  Gargas can make out a *prima facie* case of retaliation by showing (1) he availed himself of a protected right under the FMLA, (2) his employer knew he availed himself of his FMLA right, (3) he suffered an adverse employment action, and (4) there was a causal connection between the exercise of his rights under the FMLA and the adverse employment action.  *Marshall*, 854 F.3d at 381.  If he makes out this case, the burden shifts back to Estes Express to articulate a legitimate, non-discriminatory reason for the adverse action.  *Id.* at 382.  If Estes Express does so, the burden shifts back, and Gargas must show that Estes Express's articulated reason is a pretext for unlawful discrimination.  *Id.* at 382-83.  Ultimately, "[a] plaintiff proceeding under a retaliation theory must show discriminatory or retaliatory intent."  *Tennial*, 840 F.3d at 308.

Gargas argues Estes Express retaliated against him for requesting to be reinstated after taking FMLA leave by denying his request for reinstatement and then firing him.  (*See* Doc. No. 49 at 28).  Estes Express argues there is no causal connection between its adverse actions—denying reinstatement and then firing Gargas—and Gargas's exercise of rights under the FMLA.  (*See* Doc. No. 55 at 24).  Further, Estes Express argues Gargas's stated inability to work at night was a legitimate reason to take these actions, and Gargas cannot show pretext.  (*See id.* at 25-26).

Even if Gargas could establish a prima facie case of FMLA retaliation, Estes Express has articulated a legitimate, non-discriminatory reason for failing to reinstate him and then fire him, and I conclude he has failed to show this explanation was a pretext for retaliation.

As with the disability discrimination claim above, Estes Express argues it failed to reinstate Gargas, and then fired him, because he could not fully perform the functions of his job or any equivalent position.  (*See* Doc. No. 55 at 25).  This is a legitimate, non-discriminatory reason because "[t]he FMLA does not require employers to reinstate an employee if the employee is no longer able

to perform his or her former job." *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x. 783, 789 (6th Cir. 2006) (citation omitted).

As in the disability discrimination context, "[a] plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). Ultimately, "a reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Id.* (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515).

Unfortunately, Gargas' briefing contains scant discussion of pretext for his FMLA retaliation claim. His opening brief does not address pretext for his FMLA retaliation claim at all, instead focusing on proving his *prima facie* case. (*See* Doc. No. 49 at 28-29). And in his opposition brief, he discusses both FMLA claims under the combined heading "FMLA Interference/Retaliation," making it difficult to discern what pretext arguments, if any, Gargas actually makes. (Doc. No. 57 at 33). And though this section lists events and makes a single, passing reference to a "retaliatory" action, Gargas makes no "sustained argument as to how these observations relate to his claim." *Smith*, 505 F. App'x at 488. Ultimately, I reject Gargas's FMLA retaliation claim because he has failed to explain how the record evidence in this case shows FMLA-based discrimination "was the real reason" Estes Express denied his bid for reinstatement and then fired him. *Seeger*, 681 F.3d at 285 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515).

I grant Estes Express's motion for summary judgment, and I deny Gargas's motion, as to Gargas's FMLA retaliation claim (Count 2).

## V.    CONCLUSION

For the reasons explained above, I deny Gargas's motion for summary judgment in its entirety. (Doc. No. 49). I grant Estes Express's motion for summary judgment as to Gargas's

FMLA interference claim (Count 1), FMLA retaliation claim (Count 2), and Ohio law retaliation claim (Count 5).  I deny Estes Express's motion for summary judgment as to Gargas's Ohio law disability discrimination claim (Count 3) and Ohio law failure to accommodate claim (Count 4). (Doc. No. 50).  In addition, I grant in part and deny in part Gargas's motion to disregard portions of the First Declaration of Tracy Hughes.  (Doc. No. 58).  At this stage of the case, Gargas's Ohio law disability discrimination and failure to accommodate claims, in Count 3 and Count 4, remain.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge